**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| STATE OF MISSOURI,<br>STATE OF GEORGIA,<br>STATE OF ALABAMA<br>STATE OF ARKANSAS,<br>STATE OF FLORIDA,<br>STATE OF NORTH DAKOTA, and<br>STATE OF OHIO<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION,<br><br>MIGUEL A. CARDONA, in his official<br>capacity as Secretary, United States<br>Department of Education, and<br><br>JOSEPH R. BIDEN, Jr., in his official<br>capacity as President of the United States,<br><br>　　　*Defendants*. | Civil Action No. <u>2:24-cv-00103-LGW-BWC</u><br><br>**EMERGENCY TRO requested<br>immediately, but no later than<br>September 6, 2024**<br><br>**If necessary, TRO hearing requested as<br>soon as possible.** |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY/
PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 4

I.   The Higher Education Act of 1965 and Amendments ............................................ 4

II.  The President, Department, and Congress all conclude that the Secretary lacks authority to forgive loans under section 432(a) of the HEA, 20 U.S.C. § 1082(a). ........................... 5

III. The President and Department flip flop position and (unsuccessfully) attempt to mass cancel loans twice. ................................................................................................. 6

IV. The President and Secretary launch a third attempt to mass cancel loans. ........................ 9

V.  Defendants' Rush To Implement The Third Mass Cancellation Rule Before Congressional and Judicial Review. ......................................................................... 12

SUMMARY OF ARGUMENT ........................................................................................ 14

STANDARD OF REVIEW .............................................................................................. 17

ARGUMENT ..................................................................................................................... 18

I.   The Third Mass Cancellation Rule is a "final rule" for purposes of the APA. ................ 18

II.  The States Have Standing. ...................................................................................... 20

    A.  The Third Mass Cancellation Rule harms the State of Missouri by harming MOHELA in several ways. ............................................................................... 22

    B.  The Third Mass Cancellation harms North Dakota's banking business. ....................... 26

    C.  The Third Mass Cancellation Rule injures the States' financial interests in collecting tax revenues on forgiven student loans. ......................................................... 28

III. The States Are Likely to Succeed on the Merits. ................................................... 29

    A.  The Third Mass Cancellation Rule violates the major questions doctrine because the Secretary cannot identify "exceedingly clear language" authorizing the Secretary to cancel hundreds of billions in student loans. .......................................... 30

    B.  The Third Mass Cancellation Rule is in excess of statutory authority ........................... 35

    C.  The Third Mass Cancellation Rule is arbitrary and capricious. .................................... 41

    D.  The Third Mass Cancellation Rule was promulgated in violation of statutory procedures. ...................................................................................................... 44

IV. Plaintiff States Face Irreparable Harm. ................................................................. 45

V.  The Balance of Harms and Public Interest Favor the Plaintiff States. ........................... 47

VI. A Complete Administrative Stay or Temporary Restraining Order Are Necessary to Ensure Complete Relief. ........................................................................................ 49

VII. If the Court denies Relief, it Should Grant an Administrative Stay or Injunction Pending Appeal to Give the States Time to Seek Emergency Relief in the Appellate Court. ......... 52

CONCLUSION .................................................................................................................. 52

## INTRODUCTION

Plaintiff States are forced to seek emergency TRO relief or an emergency stay under the APA, 5 U.S.C. § 705, because the States have just uncovered documents revealing that the Secretary of Education (1) is unlawfully trying to mass cancel hundreds of billions of dollars of student loans, and (2) has surreptitiously issued an order for forgiveness to begin "immediately" as early as *this week*.  Without immediate judicial intervention, the Secretary will unlawfully forgive $73 billion virtually overnight, with hundreds more billions in losses to follow.

This is the *third* time the Secretary has unlawfully tried to mass cancel hundreds of billions of dollars in student loans.  Last year, the Supreme Court declared the Secretary's first attempt at mass student loan cancellation to be a "staggering" and unlawful effort to "unilaterally alter large sections of the American economy." *Biden v. Nebraska*, 143 S. Ct. 2355, 2372–73, 2375 (2023).  Minutes later the Secretary announced he was finalizing his backup mass cancellation plan.  And just last week, the Supreme Court ruled against *that* plan as well—this time without any dissent.  *Biden v. Missouri*, No. 24A173 (Aug. 28, 2024) (denying Secretary's request to vacate injunction).

Just one week later, the Secretary is at it again with another staggering assertion of unbridled authority—in his words, he claims "authority to waive *all* or part of *any* debts."  89 Fed. Reg. 27,565 (emphasis added).  But this time he is trying to forgive loans quietly, knowing that that "the States cannot turn back the clock on any loans that have already been forgiven." *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157, at *4 (8th Cir. Aug. 9, 2024).  Through compulsory process at the end of August, the States have just obtained documents revealing that the Secretary is implementing this plan *without* publication and has been set on doing so since May.  Those documents reveal that the Secretary has issued orders to forgive loans beginning **as early as this week**—all without giving the public notice.

Not only is this third attempt at mass cancellation the Secretary's most aggressive, but it is the weakest one yet. The Secretary's newest mass cancellation plan suffers from a bevy of defects, but four stand out.

First, it is plainly contrary to binding precedent. Interpreting the Secretary's forgiveness authority, the Supreme Court held last year that "Congress opted to make debt forgiveness available *only* in a few particular exigent circumstances." *Biden v. Nebraska*, 143 S. Ct. at 2369 (emphasis added). The Secretary, in sharp contrast, asserts carte blanche authority to forgive "all or part of any" student loans. 89 Fed. Reg. 27565. That assertion is fundamentally inconsistent with how the Supreme Court has already interpreted the Secretary's authority.

Second, the Secretary's mass forgiveness plan flouts the major questions doctrine—just like the first two cancellation plans did. When, as here, a regulation is of "vast economic and political significance," the Secretary must identify "exceedingly clear language" authorizing the program. *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). The Secretary asserts an unprecedented statutory interpretation—rejected by his own Department just three years ago—that would give the Secretary unfettered power to cancel every penny of every federal student loan. No text in the statute comes remotely close to justifying this sweeping assertion. Indeed, the text on which the Secretary here relies ("enforce, pay, compromise, waive, or release") is strikingly similar to the "waive or modify" language that the Supreme Court said was insufficient the first time the Secretary tried to mass cancel loans.

It gets worse. A third reason the Secretary's argument fails is that the language he relies on does not even apply to the current loan program. The Secretary relies on section 432(a) of the Higher Education Act, which governs loans under the older Family Federal Education Loan program, not the current Direct Loan program. The Secretary does not deny this. Instead, he

asserts that the Direct Loan program incorporates provisions of the FFEL program through another provision, section 451.  But that provision incorporates section 428, *not* section 432(a).  Section 428 concerns interest subsidies, not any kind of massive loan forgiveness.  The FFEL text on which the Secretary relies simply is not part of the Direct Loan program at all.

Fourth, this newest rule tries to evade the injunction against the second mass cancellation rule.  That rule—called the SAVE rule—was enjoined by a district court in Missouri in June.  The Secretary immediately promulgated what he called a new "hybrid" plan to evade that injunction, which "rendered the injunction a nullity." *Missouri*, 2024 WL 3738157, at *2.  The Eighth Circuit was forced to intervene and enter a new injunction, prohibiting the Secretary from implementing the SAVE plan to individuals enrolled in that plan.  *Id.*  And last week the Supreme Court chose to leave the injunction in effect, without any dissents.  But now the Secretary has found a way to implement the enjoined SAVE plan anyway: just give the benefits to millions of individuals who *could* enroll but have not yet.  By again attempting to roll out a rule to evade the existing injunction, the Secretary has made judicial relief again necessary.

All this and more explains why the Secretary now is trying to quietly rush out this rule too quickly for anybody to sue.  He knows that "the States cannot turn back the clock on any loans that have already been forgiven." *Missouri*, 2024 WL 3738157 at *4.  So it does not matter how many rules he breaks in the process, so long as he forgives billions of dollars in debt before the courts stop him.  This Court should not permit that brazenly lawless action to continue.  Regrettably, the Secretary's extraordinary actions have made immediate relief—including through a TRO—necessary.

## FACTUAL BACKGROUND

### I.   The Higher Education Act of 1965 and Amendments

In 1965, Congress enacted the Higher Education Act ("the HEA") to provide financial assistance to students. 20 U.S.C. §§ 1071 *et seq.* The HEA provides for two forms of financial assistance: grants and loans. §§ 1070 to 1087-4. Initially, the HEA gave the Federal Government authority only to guarantee loans issued by private organizations; the Federal Government could not issue loans directly. 20 U.S.C. §§ 1071 et seq. In 1993, however, Congress amended the HEA to authorize direct loans from the Federal Government to students and to allow the Department to offer plans for repayment of those loans. 20 U.S.C. §§ 1087a *et seq.*

Under the Direct Loan program, the HEA generally provides five repayment plans: (i) "a standard repayment plan, with a fixed annual repayment amount paid over a fixed period of time, not to exceed 10 years;" (ii) "a graduated repayment plan paid over a fixed period of time, not to exceed 10 years;" (iii) "an extended repayment plan, with a fixed annual or graduated repayment amount paid over an extended period of time, not to exceed 25 years;" (iv) "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years;" and (v) "an income-based repayment plan that enables borrowers who have a partial financial hardship to make a lower monthly payment." 20 U.S.C. § 1087e(d)(1).

Generally, the HEA requires individuals to repay their loans plus interest. The Act requires "repayment of such loan, including principal and interest," § 1087e(d)(1), and further requires that the "balance due" from each borrower "shall equal the unpaid principal amount of the loan, any accrued interest, and any fees," § 1087e(e)(5). Only one of these repayment plans, the income-based repayment plan (IBR), creates an exception to the repayment requirement. It prescribes specific payments and then provides the Secretary with authority to "repay or cancel any

outstanding balance of principal and interest due" by a borrower after 20 to 25 years of those statutory payment amounts.  20 U.S.C.§ 1098e(b)(7).

Beyond the income-based repayment plan, Congress has authorized forgiveness "only in certain limited circumstances." *Biden*, 143 S. Ct. at 2363; *see, e.g.*, 20 U.S.C. §§ 1087e(m), 1087ee.  In these cases, as with the IBR plan, the Act creates an explicit exception to student loan repayment obligations.  *E.g.*, § 1087ee ("Cancellation of loans for certain public service"— teachers, military service members, and Peace Corps volunteers).  The HEA does not permit broad interest waivers or subsidies in the Direct Loan program.  Instead, Congress has authorized the Secretary to subsidize unpaid interest only in the IBR program and only "for a period of not more than 3 years" after a borrower opts into that program.  20 U.S.C. § 1098e(b)(3)(A).  No parallel provisions exist in any other Direct Loan repayment plan.

## II.  The President, Department, and Congress all conclude that the Secretary lacks authority to forgive loans under section 432(a) of the HEA, 20 U.S.C. § 1082(a).

Congress has not enacted substantial amendments to the HEA, or otherwise passed laws amending the treatment of student debt, since 2010, when Congress accepted President Obama's call to make the IBR forgiveness program more generous. But that does not mean Congress has left the issue un-considered.  "'More than 80 student loan forgiveness bills and other student loan legislation' were considered by Congress during its 116th session alone." *Biden*, 143 S. Ct. at 2373.

But when congressional advocates of greater forgiveness were unable to enact new programs, they urged the President to skirt Congress and cancel loans through executive action.  In September 2020, thirteen Senators introduced a resolution asserting that the President and Secretary have statutory power to mass cancel student debt immediately.  These members cited section 432(a) of the HEA, codified at 20 U.S.C. 1082(a)), for their argument.  *Schumer, Warren: The Next*

*President Can and Should Cancel Up To $50,000 In Student Loan Debt Immediately; Democrats Outline Plan for Immediate Action in 2021* (Sept. 17, 2020).[1]

That idea was immediately shot down by President Biden, then-Speaker of the House Pelosi, and even the Department of Education. Biden described the idea that he could "cancel large amounts of debts" as "pretty questionable." Michael Stratford, *Schumer, White House at Odds over How to Cancel Student Loan Debt*, Politico (Feb. 4, 2021).[2] Pelosi professed: "People think that the President of the United States has the power for debt forgiveness. He does not. . . . That has to be an act of Congress. . . . The President can't do it." Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. News & World Report (July 28, 2021). And most notably, the Department of Education issued a memorandum in 2021 expressly disclaiming authority under section 432 to create a forgiveness program. *See* Compl. Ex. A, ("Reed Rubinstein Memo").

For its part, Congress also disagreed with the section 432 argument, rejecting resolutions in both the House and Senate that pressed the argument. S.R. 46, *A Resolution Calling on the President of the United States to Take Executive Action to Broadly Cancel Federal Student Loan Debt, 117th Congress (2021)*; H.R. 100, *Calling on the President of the United States to Take Executive Action to Broadly Cancel Federal Student Loan Debt*, 117th Cong. (2021).

### III. The President and Department flip flop position and (unsuccessfully) attempt to mass cancel loans twice.

Despite previously recognizing that they lacked authority to cancel large amounts of student loans, the Biden administration later bowed to political pressure to bypass Congress. On August 24, 2022, the Administration announced that, under the HEROES Act, it would cancel

---

[1] https://www.warren.senate.gov/newsroom/press-releases/schumer-warren-the-next-president-can-and-should-cancel-up-to-50000-in-student-loan-debt-immediately-democrats-outline-plan-for-immediate-action-in-2021

[2] https://www.politico.com/news/2021/02/04/schumer-biden-student-loan-debt-466054

$10,000 to $20,000 in student debt for all borrowers who have loans owned by the Department and whose annual income was less than $125,000 (or $250,000 for married borrowers who file jointly). *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022).[3]

Six states—including Plaintiff- Missouri and Arkansas here—successfully sued to block that unlawful executive action. In *Biden v. Nebraska*, the Supreme Court rejected Defendants' assertion that they could use a vague provision of the HEROES Act as authority to transfer half a trillion dollars in wealth from taxpayers to student loan borrowers. 143 S. Ct. 2355 (2023). In holding that "the HEROES Act provides no authorization for the Secretary's plan," the Supreme Court also found that "the 'economic and political significance' of the Secretary's action is staggering by any measure." *Id.* at 2373 (citing *West Virginia v. EPA*, 597 U.S. 697 (2022) (cleaned up)). Beyond "the ordinary tools of statutory interpretation," the Defendants' efforts were unlawful because "the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375 (cleaned up).

Upset, the Secretary criticized the ruling sharply just minutes after the Supreme Court released its ruling, calling it an "outrage," and announced that he was "today" responding to the rule by "finaliz[ing]" a new regulation to again try to mass cancel nearly $500 billion in loans. *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan*, Department of Education (June 30, 2023).[4] At the same time, Defendant

---

[3] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/
[4] https://www.ed.gov/news/press-releases/secretary-cardona-statement-supreme-court-ruling-biden-administrations-one-time-student-debt-relief-plan

Biden declared he would "stop at nothing" to mass cancel loans. *Statement from President Joe Biden on Supreme Court Decision on Student Loan Debt Relief*, The White House (June 30, 2023).[5]

Defendants published their second mass cancellation plan ten days later on July 10, 2023. This new plan purported to rely on the Secretary's authority (created by amendments to the HEA in 1993) to create "income-contingent repayment" plans. It operated by slashing payment amounts to as low as $0 for millions of borrowers and forgiving their balances after as few as 10 years of $0 "payments." That plan was even more ambitious than the first, offering mass forgiveness to individuals in the 98th income percentile, to the tune of $475 billion over just the first 10 years.

That plan also has been enjoined. Two coalitions of States sued in two different district courts, and both obtained relief from those district courts.[6] Then after the Secretary created a new plan—what he called a "hybrid" plan—without going through notice and comment, the Eighth Circuit issued an injunction against this new hybrid plan, confirming that Defendants' SAVE Plan is unlawful. *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157 (8th Cir. Aug. 9, 2024). The Eighth Circuit did not mince words, concluding that this second "attempt to engage in mass student-loan cancellation" is "even larger in scope" than the HEROES Plan attempt and "the text of the HEA makes a showing [by the Defendants] of even mere plausibility difficulty." *Id.* at * 2–3. The opinion enjoined Defendants "from any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing SAVE's payment-threshold provisions" "for any borrower whose loans are governed in whole or in part" by the SAVE Rule. *Id.* at *4.

---

[5] https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/statement-from-president-joe-biden-on-supreme-court-decision-on-student-loan-debt-relief/

[6] In a summary order without opinion, a divided Tenth Circuit stayed the District of Kansas' decision. The Tenth Circuit has held that case in abeyance given the Eighth Circuit injunction.

Following the Eighth Circuit's ruling, Defendants filed in the Supreme Court an application to vacate the injunction pending appeal. Last week, on August 28, 2024, the Supreme Court rejected Defendants' application without any dissent.

### IV.   The President and Secretary launch a third attempt to mass cancel loans.

On April 17, 2024, not long after the two state coalitions sued to block the second attempt at mass loan forgiveness, Defendants published a notice of proposed rulemaking (NPRM) titled *Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program*, 89 C.F.R. 27,564 (Apr. 17, 2024), Compl. Ex. B.

The NPRM promised a third mass cancellation effort: it proposed regulations "to provide for the waiver of certain student loan debts" and "modify the Department's existing debt collection regulations to provide greater specificity regarding certain non-exhaustive situations in which the Secretary may exercise discretion to waive *all* or part of *any* debts owed to the Department." *Id.* (emphasis added). Despite the economic and political significance of the NPRM, the Department limited the comment period to just thirty days. *Id.* The NRPM purports to authorize forgiveness in reliance on section 432(a)(6) of the HEA, which is codified at 20 U.S.C. § 1082(a)(6). That text authorizes the Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption"—but only for FFEL *private* loans, not the Direct Loan program, and only "[i]n the performance of, and with respect to, the functions, powers, and duties, vested in him." *Id.*

To overcome this explicit limitation, Defendants assert that "[i]n creating the Direct Loan program, Congress established parity between the FFEL and Direct Loan program, providing that Federal Direct Loans 'have the same terms, conditions, and benefits as loans made to borrowers,'

under the FFEL program." *Id.* They rely on section 451(b)(2) of the Act, 20 U.S.C. § 1087a(b)(2), which provides that "loans made to borrowers under [the Direct Loan program] have the same terms, conditions, and benefits as loans made under section 428 [20 U.S.C. § 1078]." In other words, Defendants are relying on a provision that incorporates a *different* section of the FFEL program (428), not the one they need (432).

Proceeding in reliance on section 432 even though the Direct Loan program does *not* incorporate section 432, Defendants assert authority for the Secretary to "waive *all* or part of *any* debts" and then promulgates several sections in the Code of Federal Regulations, "§§ 30.81 through 30.88," to mass forgive loans. 89 Fed. Reg. 27,614 (emphasis added) (creating a 34 C.F.R. § 30.80, *et seq.*).

Summed up, these new provisions (1) create an end-run around existing injunctions by granting forgiveness to borrowers who cannot sign up for plans that have been enjoined, (2) forgive interest for millions of borrowers up to $20,000, and (3) forgive balances for borrowers who attended programs that the Secretary (in his sole discretion) believes were not valuable programs.

Defendants summarize §§ 30.81 through 30.88 as authorizing the Secretary to:

- Forgive to the tune of $73 billion the amount by which a borrower's current loan has an outstanding balance greater than the original principal of the loan—in other words, forgive all interest,

    o For individuals on income-driven plans and have household incomes of less than $240,000 (married filing jointly) or $120,000 (single), all interest (capitalized and uncapitalized) is forgiven (§ 30.81);

    o For all other individuals (including households making more than $240,000 a year), forgiveness is limited to $20,000 per borrower (§ 30.82);

- Forgive balances for undergraduate borrowers after 20 years and graduate borrowers after 25 years (§ 30.83);

- Forgive balances for borrowers whom the Secretary believes "meets the criteria for forgiveness under an IDR plan," such as the SAVE Plan, even though they did not sign

up for that plan and even though some of those plans (including the SAVE Plan) have been enjoined (§ 30.84);

- Forgive balances for every borrower whom the Secretary believes "meets the eligibility criteria" for forgiveness under the FFEL private loan program or Direct Loan program even though they did not apply (§ 30.85);

- Forgive balances for borrowers who obtained a loan from an institution or program that the Secretary has determined is no longer eligible to participate in the federal grant and loans program—even though the institutions were eligible at the time (§ 30.86);

- Forgive balances for borrowers whose institutions have closed, if the Secretary believes the institution "for at least one year" did not meet the Secretary's accountability standard or "failed to provide sufficient financial value to students and was subject to a program review, investigation, or any other Department action that remained unresolved at the time of closure" (§ 30.87); and

- Forgive balances for individuals who enrolled in "gainful employment" programs (non-degree programs) that have closed and which the Secretary believes did not lead to high enough incomes (§ 30.88).

Defendants also state that they will forgive balances on Direct Loans that were formerly FFEL private loans and have been refinanced/consolidated into Direct Loans.  89 Fed. Reg. 27,569 (§ 682.403(f)).  Separately, Defendants seek to remove the current requirement that the Secretary use the Federal Claims Collection Standards (FCCS)—a joint Department of Treasury and Department of Justice regulatory scheme based on 31 U.S.C. § 3711.  *Id.* at 27,613.  The FCCS provides limited circumstances in which a government agency may compromise a debt of under $100,000.  *See* 31 C.F.R. § 902.

Defendants estimate that, all told, implementation of the Third Mass Cancellation Rule provisions would cost $146.9 billion.  89 Fed. Reg. 27,565–66.  As is, that estimate is based on the flawed assumption that Defendants would succeed in promulgating and defending their second attempt at mass cancellation, which they have not.  Moreover, their Third Mass Cancellation Rule attempts to provide relief under the SAVE Plan indirectly to individuals despite the existing

11

injunction. The actual cost of the Third Mass Cancellation Rule is thus the $146.9 billion estimated by the Department plus much of the $475 billion cost of the SAVE Plan.

## V. Defendants' Rush To Implement The Third Mass Cancellation Rule Before Congressional and Judicial Review.

Given the extraordinary cost of this Rule, the Federal Government has unsurprisingly classified this rule as a "major" rule under the Congressional Review Act. *See* Office of Information and Regulatory Affairs, RIN: 1840-AD93.[7] Under federal law, "major" rules are not permitted to take effect until 60 days after publication. 5 U.S.C. § 801(a)(3). The purpose of this law is to give Congress an opportunity to review the rule—and perhaps vote to repeal it—before the rule goes into effect. Id. § 801(a), (b).

Despite not formally publishing their Third Mass Cancellation Rule, Defendants have quietly instructed the half-dozen loan-servicing organizations that contract with the Federal Government to immediately start cancelling loans and balances beginning as early as *this week* and to fully implement the Third Mass Cancellation Rule by September 20.

Further supporting this effort, the Secretary emailed student loan borrowers in early August, writing that "the U.S. Department of Education (ED) aims to provide debt relief to certain borrowers this fall," and informing borrowers that "[i]f you WANT to be included in potential student debt relief, you don't need to take any action." Compl. Ex. B ("Opt-Out Email"). Each borrower had until the end of August to decide whether to opt-out. *Id.* The email explained that "the regulations would authorize [the Secretary] to provide partial or full debt relief to borrowers" in four circumstances: (a) "Borrowers who owe more than they did at the start of repayment;" (b) "Borrowers who first entered repayment many years ago;" (c) "Borrowers who are otherwise

---

[7] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=1840-AD93

eligible for loan forgiveness but have not yet applied;" and (d) "Borrowers who enrolled in low-financial value programs." *Id.* These provisions are the same as those proposed in the NPRM.

Defendants' unusual decision to ask people to confirm whether they want to opt out of a program *before* it is even published created concern that Defendants are planning to unlawfully rush out the Third Mass Cancellation Rule to cancel as much debt as possible, creating a *fait accompli* before anybody has time to challenge the action.  Indeed, in late August the States used compulsory process to obtain documents sent from the Secretary to federal contractors instructing those contractors to begin cancelling loan balances beginning as early as September 3.  Specifically, the Department sent the contractors—including Missouri's public instrumentality and contractor, MOHELA—a document entitled "Business Operations Change Request Form" plus attachments.  Compl. Ex. D at 1.  The document instructs all servicing organizations to report balances of all loans to the Department between September 2 and September 5 and to fix any errors by September 6.  *Id.* at 3.  At that point, the Department will submit "forgiveness files" to the contractors, which the contractors are instructed to process "*immediately* upon receipt."  *Id.* at 4 (emphasis added).  Evidencing this rapid timeline, the Department emailed MOHELA on August 21, 2024, with an "updated schedule" for the Third Mass Cancellation Rule, which provided that "[t]he anticipated *completion* date" for all debt discharge "will be three business days after delivery of the discharge file.  Compl. Ex. E (emphasis added).

So if a servicing organization reports a set of balances to the Department on September 2 without error or if errors are resolved that day, loan servicing organizations will be required to "immediately" begin forgiving loans as early as September 3 and have the process completed by September 6.  If servicing organizations take the full time allotted to resolve errors—until September 6—then "immediate" forgiveness will begin as soon as September 7 and must be

completed as soon as September 11. The immediate, overnight harm will be at least $73 billion. That is the Secretary's estimate for the amount of loans that will be immediately cancelled on day one from the provisions wiping out loan balances that exceed original-principal balances. 89 Fed. Reg. 27,565–66. The full cost of the rule will only grow every day after that.

Moreover, the Department documents instruct the contractors to backdate forgiveness. "All forgiveness shall be applied with an effective date of 9/1/2024." Compl. Ex. F at 3 ("Business Operations Change Request Form"). This is a bald-faced attempt to skirt review. To date, the Defendants have refused to clarify that they intend to implement the Third Mass Cancellation Rule before the close of the statutorily-required, 60-day, congressional review period. Compl. Ex. I at 2–3 ("Representative Foxx Letter"). The evasion confirms they are.

## SUMMARY OF ARGUMENT

**I.** The Third Mass Cancellation Rule is a "final rule" for purposes of the APA.

**II.** The Plaintiff States have standing. Only one plaintiff needs standing for the suit to proceed.

**II.A.** Missouri has standing for many reasons. The simplest is that the Third Mass Cancellation Rule imposes unrecoverable administrative costs on MOHELA. The States also have standing for the same reasons the Supreme Court found Missouri had standing last year to challenge Defendants' first attempt at mass debt cancellation and the Eighth Circuit found Missouri had standing to challenge Defendants' second attempt at mass debt cancellation last month. Missouri has a public instrumentality—MOHELA—that services and owns student loans. It gets paid an administrative fee by the Federal Government for every account it services. By unlawfully forgiving loans and zeroing out accounts, the Third Mass Cancellation Rule harms MOHELA in exactly the same way the last two rules did. And any harm to MOHELA, the

14

Supreme Court held, is also a harm to Missouri.  The Third Mass Cancellation Rule also harms MOHELA a third way: it induces borrowers to consolidate older loans that are owned by MOHELA into loans owned by the Federal Government, depriving MOHELA of the revenue it generates from the loans it owns (such as interest revenue).

**II.B.** North Dakota has standing because it runs a state-owned bank that is engaged in the business of providing loans to students enrolled in higher education courses.  The Third Mass Cancellation Rule unlawfully imposes a direct competitive harm against this state-owned bank.

**II.C.** Several of the Plaintiff States also tax forgiven student loan revenue.  But because of a federal law, loans forgiven before 2026 will not be taxed.  The Third Mass Cancellation Rule deprives the States of taxation revenue by accelerating forgiveness of loans to before 2026.

**III.** The States need only establish a "fair chance of prevailing" on the merits.  They have done much more than that.

**III.A.** Last year, the Supreme Court held that Defendants' first attempt at mass debt cancellation triggered the "major questions doctrine," which requires the agency to identify "exceedingly clear language" in statute authorizing the agency action.  Last month, the Eighth Circuit held that Defendants' second attempt at mass debt cancellation did the same.  The Third Mass Cancellation Rule clocks in at a minimum of $150 billion on the same topic (triple the $50 billion the Supreme Court has previously found triggered the doctrine), so this rule necessarily also triggers the major questions doctrine.  And Defendants cannot identify any "exceedingly clear language."  In fact, the statutory provision on which they rely does not authorize mass "waivers"—*i.e.*, cancellation—in the relevant loan programs at all, much less "clearly" so.  To the contrary, it uses strikingly similar language to the statute that the Supreme Court held last year does not satisfy the major questions doctrine.

15

**III.B.** Even applying the ordinary tools of statutory interpretation, Defendants' action must fall.  The text the Secretary relies on applies only to an older loan program (FFEL private loans) not the current Direct Loan program.  In any event, the Secretary's attempt to use banal text as a universal grant of forgiveness authority cannot be squared with the many loan forgiveness provisions Congress expressly created.  That is why the Department expressly rejected the Secretary's position just three years ago.  Longstanding textual canons prohibit reading the statute to render superfluous the many forgiveness provisions that Congress meticulously created.

Even if the Secretary had the authority he claims, he could not implement it now.  The Higher Education Act gives entities subject to a regulation discretion not to implement the regulation before July 1 of the following year.  The Secretary is thus wrong to try to force servicing organizations to implement that regulation 11 months early.

**III.C.** Setting aside statutory arguments, the Third Mass Cancellation Rule is also arbitrary and capricious.  This newest rule is an attempt to evade the Eighth Circuit's injunction against the Save Plan.  That injunction prohibits implementation of the plan to anybody enrolled in the plan.  But the Secretary now is trying to apply that plan to people who have not *yet* enrolled.  The Secretary has also rolled out the rule without public notice in an express attempt to forgive loans before anybody could sue.  In doing so, the Secretary blatantly violated federal law prohibiting "major" rules from going into effect until 60 days after publication.

**IV.** The harms are irreparable as the Eighth Circuit has twice concluded.  The States cannot turn back the clock and recoup their losses once the Secretary begins unlawfully forgiving loans.

The purpose of preliminary relief is to maintain the status quo, which is accounts that have not yet been forgiven.  The Court should maintain that status quo.

**V**. The balance of harms favor relief.  Defendants seek to impose a massive windfall on a comparatively small proportion of Americans, while saddling American taxpayers with hundreds of billions of dollars in national, taxpayer debt.  There is no harm to Defendants if they are forced to wait to implement the rule.  Indeed, in 2022, they voluntarily agreed not to implement the rule while waiting for the district court to adjudicate the preliminary injunction motion.  There is massive harm to Plaintiffs and the public if they are permitted to march forward.

**VI.** An immediate administrative stay or temporary restraining order barring Defendants from implementing the rule before the merits of this case are adjudicated is wholly proper to maintain the status quo and the opportunity for complete relief.  The relief should also be against the entirety of the rule.  As the Eighth Circuit has twice concluded, there is no practical way of limiting relief to the Plaintiff States because MOHELA is a nationwide, dynamic industry (with loans flowing in and out).  The only way to afford full relief to the plaintiffs—the Eighth Circuit has twice concluded—is to enjoin *any* implementation under the rule.

### STANDARD OF REVIEW

The APA expressly enables this Court "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  "This APA provision authorizes reviewing courts to grant relief pending review."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 668 n.4 (D.C. Cir. 2016).  The stay power under § 705 authorizes broader relief than traditional equitable remedies against officials.   "[A]n injunction is a judicial process or mandate operating *in personam*."  *Nken v. Holder*, 556 U.S. 418, 428 (2009).  "By contrast, instead of directing the conduct of a particular actor, a stay operates

upon the judicial proceeding itself"—or, in this case, against the administrative proceeding. *Id.* The APA thus gives this Court broader authority to stay the Third Mass Cancellation Rule than would be true of an action for injunctive relief against a government official. To grant a stay, the Court must consider ""(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (citations omitted).

Even if this Court did not have specific statutory authority, it could still apply background equitable principles to issue a TRO or preliminary injunction. "To receive a preliminary injunction, the plaintiff must clearly establish the following requirements: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)). "Likelihood of success on the merits 'is generally the most important of the four factors.'" *Am. All. for Equal Rts. v. Fearless Fund* Mgmt*., LLC*, 103 F.4th 765, 775 (11th Cir. June 3, 2024) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020)).

## ARGUMENT

The States plainly have standing, and on the merits, Defendants' actions suffer from all the same flaws that doomed their first and second attempts at mass debt forgiveness.

### I.     The Third Mass Cancellation Rule is a "final rule" for purposes of the APA.

As a threshold matter, just like when the States sued to challenge the HEROES Plan before formal publication, the Department's actions here are "final agency action" subject to challenge

under the APA.  5 U.S.C. § 706.  The Supreme Court "has consistently taken a 'pragmatic' and 'flexible' approach to the question of finality."  *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 997 n.1 (8th Cir. 2015) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–50 (1967)). To be final, an agency's action must meet two requirements: (1) "the action must mark the 'consummation' of the agency's decision making process;" and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Tennessee Valley Auth. v. Whitman*, 336 F.3d 1236, 1248 (11th Cir. 2003) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  The Third Mass Cancellation Rule meets both conditions.

The Third Mass Cancellation Rule marks the end of the decisionmaking process.  As revealed by the "Change Request" document that the Secretary already sent (surreptitiously) to federal contractors, Defendants are demanding that federal contractors begin forgiving loans "immediately" after receiving the "forgiveness files," which will occur as early as September 3. There is nothing tentative about the Department's demands.  The Department has already concluded the categories of borrowers whose loans it intends to cancel:  (1) borrowers whose "current balance exceeds original principal balance;" (2) borrowers who have had loans outstanding "after 20 or 25 years;" and (3) "borrowers eligible for forgiveness on the SAVE plan but have not applied for the SAVE plan." Compl. Ex. D at 3–6 ("Change Request").

What matters is that the critical aspects of the Third Mass Cancellation Rule—amounts, program contours, and timeline—will not change.  Indeed, these details have long been set in stone. The Secretary initially sent a Change Request form dated May 31, 2024, with an "anticipated implementation date" of September 1.  Then on June 18, the Secretary sent a revised attachment to the Change Request form (included in the exhibit) that made clear the implementation date was no longer "anticipated."  Compl. Ex. F at 3 ("Implementation Date: 9/1/2024").  Then, on August

2, 2024, the Department informed servicers that it "cannot change the due date" and prodded them to have their systems tested "before implementation."   Compl. Ex. G ("8/2/2024 Department Email").

The Third Mass Cancellation Rule also has "determined rights [and] obligations."  *Sackett v. EPA*, 566 U.S. 120, 126 (2012) (quotations marks omitted).  It determines the rights of millions of student-loan borrowers and obligations of organizations like MOHELA by altering the legal regime for student loans, and "direct and appreciable legal consequences" will flow from it. *Bennett*, 520 U.S. at 178.

Just like a decision binding agency staff to discontinue a program was "final agency action under the APA."  *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022), Defendants' decision here to mass cancel tens or hundreds of billions of dollars in student loans is final agency action.  Indeed, it is final agency action of the worst kind because Defendants are taking this action surreptitiously to try to mass forgive loans before any opportunity for judicial review.

## II.  The States Have Standing.

Plaintiff States easily have standing to challenge the Third Mass Cancellation Rule.  To establish standing, "the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  *Biden v. Nebraska*, 143 S. Ct. at 2365.   "[I]f we have at least one individual plaintiff who has demonstrated standing, we do not need to consider whether the other plaintiffs have standing to maintain the suit."  *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124–25 (11th Cir. 2019) (cleaned up); *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018) ("Where only injunctive relief is sought, *only one plaintiff* with standing is required." (emphasis added)).

Financial harms, no matter how minor, constitute injuries-in-fact.  *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").  Intangible harms also constitute concrete harms.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (gathering sources).  And future injuries can support standing so long as "there is a substantial risk that the harm will occur."  *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

An injury is "fairly traceable" to a challenged statute when there is a "causal connection" between the two."  *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61 (1977)).  "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," though "[h]e need not show that a favorable decision will relieve his every injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).  "[S]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties."  *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998).  "[E]ven harms that flow indirectly from the action in question can be said to be "fairly traceable" to that action for standing purposes.  *Focus on the Fam.*, 344 F.3d at 1273 (citing *Loggerhead Turtle*, 148 F.3d at 1250–51.

Plaintiff States raise several claims under the APA, one of which asserts a violation of separation of powers.  For a separation-of-powers claim, a plaintiff must show that it "sustains injury from an executive act that allegedly exceeds the official's authority."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) (cleaned up).  For APA claims that implicate a State's sovereign and quasi-sovereign interests, States are "entitled to special solicitude in [the] standing

21

analysis"—though, to be clear, the States do not even need that here. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007). "[I]f nothing else, that means imminence and redressability are easier to establish here than usual." *Texas v. Biden*, 20 F.4th 928, 970 (5th Cir. 2021), *rev'd on other grounds* 142 S. Ct. 2528 (2022).

Here, Plaintiff States will imminently suffer injury from the Third Mass Cancellation Rule in three distinct ways: The Third Mass Cancellation Rule (1) harms Missouri through financial injury to its instrumentality, The Higher Education Loan Authority of the State of Missouri ("MOHELA"); it (2) harms the proprietary business of North Dakota; and it (3) harms Plaintiff States' financial interest in collecting tax revenues on forgiven student loan debt.

### A.  The Third Mass Cancellation Rule harms the State of Missouri by harming MOHELA in several ways.

For the same reason the Supreme Court found standing in *Biden v. Nebraska*, and the Eighth Circuit found standing in *Missouri v. Biden*, Missouri again has standing here. *E.g.*, *Missouri*, 2024 WL 3738157, at *3 ("As a threshold matter, we agree with the district court that 'the allegations in the Complaint are substantially similar to, if not identical to, those the Supreme Court held were sufficient to establish Missouri's standing just last year in *Biden v. Nebraska*.'") (brackets accepted).  There are only about a half-dozen organizations that get paid to service federal student loans.  One is MOHELA, a Missouri public instrumentality.  As the Supreme Court ruled last year, because "MOHELA is a 'public instrumentality' of the State," any "harm to MOHELA is also a harm to Missouri." *Biden v. Nebraska*, 143 S. Ct. at 2366 (quoting Mo. Rev. Stat. § 173.360).  The Third Mass Cancellation Rule harms MOHELA (and thus Missouri) in at least four ways.

First, it imposes administrative costs on MOHELA.  "[A]dministrative costs and burdens imposed by the Rule on petitioner constitute a concrete and particularized injury." *New Jersey v.*

*EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021).  The Change Request expressly acknowledges that the Third Mass Cancellation Rule will impose administrative costs, which the Federal Government says MOHELA must cover.  *E.g.*, Compl. Ex. D at 8 ("Change Request").  The States (on behalf of MOHELA) can thus sue because MOHELA would not have to expend these administrative costs but for the unlawful rule.  Moreover, because the Defendants direct MOHELA to complete the initial and largest stage of the Third Mass Cancellation Rule's cancellation in just three business days, MOHELA must expend enormous administrative capital to comply.  This includes costs associated with the hiring and training of new call center representatives, at the direction of Defendants, to field calls starting September 9, 2024, about the Third Mass Cancellation Rule. Compl. Ex. L ("New Employee Directive").

Second, the Third Mass Cancellation Rule will deprive MOHELA of administrative servicing fees it is supposed to receive.  As a servicer of federally-owned student loans, MOHELA receives income per loan account it services per month.  For this reason, the Supreme Court ruled last year that Missouri had standing to challenge rules that would close accounts or decrease account balances because those rules decrease MOHELA's administrative servicing revenue. *Biden v. Nebraska*, 143 S. Ct. at 2366.  The same is true here.  As of last year, MOHELA serviced over 7.8 million accounts representing $344 billion in loans, and it earns fees from the Federal Government of $279.2 million each year to service those loans.  *See Financial Statements and Schedule of Expenditures of Federal Awards: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2023 and 2022 With Reports of Independent Auditors* 4, MOHELA (2023) ("FY 2023 Financial Statement")[8] at 7 ("MOHELA FY 2023 Financial Statement").  By April 2024, MOHELA's federally-owned student loan portfolio had

---

[8] Available at https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx

risen to over 8 million borrower accounts.  Compl. Ex. K, ¶ 3 ("Kvaal Declaration").  The Third

Mass Cancellation Rule will grant immediate cancellation of tens, if not hundreds, of billions of

dollars in student loan debt, causing account balances to prematurely go to $0, depriving

MOHELA of administrative fees for accounts it otherwise would have been paid to service but for

the Third Mass Cancellation Rule.  That makes this an open-and-shut case for standing under last

year's Supreme Court decision.

Third, MOHELA recently also became the servicer for FFEL private loans held by Navient

(the successor of Sallie Mae).  MOHELA earns administrative servicing fees by servicing these

loans.  MOHELA faces imminent loss of loan servicing revenue through this income stream due

to the Third Mass Cancellation Rule's provisions waiving outstanding FFEL private loans *and*

encouraging consolidation.  Under the Third Mass Cancellation Rule, borrowers will refinance

their FFEL private loans into Direct Loans.  When they do so, the Navient loans will be discharged,

and MOHELA will lose the stream of revenue it currently receives from servicing those loans.

Fourth, the Third Mass Cancellation Rule deprives MOHELA of revenue it earns from

loans MOHELA itself owns.  While much of what MOHELA does is service loans owned by the

Federal Government, MOHELA itself owns $874 million of FFEL private loans.  *See* MOHELA

FY 2023 Financial Statement at 6, 8.  The Supreme Court also found this fact relevant to standing

last year.  *Biden v. Nebraska*, 143 S. ct. at 2365 ("The Authority owns over $1 billion in FFELs.").

These are legacy loans issued when Congress still permitted private agencies to issue and hold

loans.  MOHELA generates revenue from those FFEL private loans--$51 million in interest

revenue just last year.  MOHELA FY 2023 Financial Statement at 7, 14.

The Third Mass Cancellation Rule drastically reduces the value of those assets by

providing borrowers an enormous incentive to consolidate FFEL private loans into loans owned

by the government and eligible for the new cancellation plan.  Specifically, by including a

provisions that give individuals with Direct loans the benefit of the SAVE Plan and allow for

waiver of balances for consolidated loans that were previously FFEL loans, the Third Mass

Cancellation Rule induces borrowers to consolidate their legacy FFEL private loans away from

MOHELA and into federal, consolidated Direct Loans.  This is not conjecture or speculation, but

the consistent reaction of borrowers each time Defendants have promulgated a new loan

forgiveness rule over the last two and a half years.  In 2022, when Defendants announced the

HEROES Plan, consolidations of MOHELA loans spiked.  *See* Compl. Ex. M ("MOHELA

Consolidation Summary").  That spike did not dissipate until December 2022, when the Supreme

Court declined to lift the Eighth Circuit's injunction against the plan.  *Id.*  MOHELA saw another

spike around late January 2024, when Defendants announced they would begin forgiving loans

under the SAVE Plan.  *Id.*  Refinancing of MOHELA loans more than tripled in February

compared to December.  *Id.*

By inducing consolidation of FFEL private loans, the Third Mass Cancellation Rule harms

MOHELA because if a borrower consolidates a FFEL private loan to take advantage of the Third

Mass Cancellation Rule's balance or interest forgiveness, MOHELA will no longer own that loan.

MOHELA will thus lose its ability to earn interest income generated by the FFEL private assets

that it owned.  That threatens the $51 million stream of interest revenue that MOHELA currently

receives.  True, when a refinancing occurs, MOHELA receives the principal of the outstanding

loan immediately.  (MOHELA receives nothing when Navient loans that MOHELA services are

refinanced.)  But MOHELA is deprived of its future stream of payments: loan principal *plus*

interest. Just like a mortgage lender will gladly trade principal today for a stream of principal plus

interest in the future, MOHELA is harmed when it is deprived of its $51 million in future interest revenue.

All these harms are directly traceable to the Third Mass Cancellation Rule.  By providing borrowers with loan forgiveness, the Third Mass Cancellation Rule drives borrowers' balances to zero and eliminates the revenue MOHELA receives from servicing those loans.  Moreover, the Third Mass Cancellation Rule provides a powerful incentive to borrowers to consolidate their FFEL private loans into direct federal loans.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding traceability based "on the predictable effect of Government action on the decisions of third parties").  And Defendants in fact expressly encourage borrowers to consolidate. Compl. ¶ 112.

Redressability is also satisfied for Missouri for each of these financial injuries.  A court order staying or enjoining and vacating the Third Mass Cancellation Rule will prevent Defendants from unilaterally driving outstanding loan balances to zero and thereby reducing the number of loans serviced by MOHELA.  Additionally, a court order will ameliorate the Third Mass Cancellation Rule's incentive to consolidate FFEL private loans into direct loans and thus prevent associated financial losses.

**B.  The Third Mass Cancellation harms North Dakota's banking business.**

Plaintiffs also have standing through the Bank of North Dakota.  The State of North Dakota "maintain[s] a system of banking owned, controlled, and operated by it, under the name of the Bank of North Dakota."  N.D.C.C. § 6-09-01.  The bank funds and administers a state-sponsored student loan program and a student loan consolidation program.  *See* N.D. Cent. Code ch. 15-62.1. The student loan offerings include the "Dakota Education Alternative Loan" or "DEAL" program for borrowers attending institutions of higher education in North Dakota.  *See* Bank of North

Dakota, *DEAL Student Loan* (last visited Apr. 8, 2024).[9]  Interest earned by the Bank of North Dakota from student loans is used to implement, maintain, and administer state programs.  *See* N.D. Cent. Code §§ 15-62.1-01; 15-62.1-05.

The Third Mass Cancellation Rule harms the financial interests of this state-owned bank by undermining its ability to compete in the business of providing and consolidating student loans. For example, the interest rate on federal student loans is set by a formula enshrined in statute.  20 U.S.C. § 1087e(b).  The Bank of North Dakota enables borrowers who have taken out federal student loans to refinance their loans as State-financed student loans when the Bank is able to offer rates lower than what the Federal Government is able to authorize. About 16,000 borrowers have refinanced their federal student loans into North Dakota-financed student loans because the Bank has been able to provide better terms.  But under the Third Mass Cancellation Rule, student loan recipients that received or consolidated their student loans through the Bank of North Dakota will not be eligible to have their loans absolved or their interest waived.  Consequently, despite the Bank's ability to offer more competitive rates and the convenience of the Bank working directly with in-state post-secondary institutions, the Third Mass Cancellation Rule will foreseeably cause many would-be student loan borrowers to forego borrowing from the Bank of North Dakota in the future if loans issued by the Federal Government will no longer require repayment.

This is particularly true with respect to the parts of the Third Mass Cancellation Rule that seek to implement the SAVE Rule (even though that rule is enjoined).  The SAVE Plan slashes payment amounts to $0 for millions of borrowers.  It does not take a Ph.D. to understand why borrowers would prefer $0 "payments" under the SAVE Plan (through the Third Mass Cancellation Rule) rather than actual repayment under a loan issued by the Bank of North Dakota.

---

[9] https://bnd.nd.gov/education-funding/apply-for-student-loan/deal-student-loan/

The bank thus experiences Article III injury when the Federal Government begins engaging in loan forgiveness programs that are contrary to law.  And because the bank is the State of North Dakota engaged in business, harms to the bank are direct harms to the State itself.  *Biden v. Nebraska*, 143 S. Ct. at 2366; *see also Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (a party "suffer[s] constitutional injury in fact when agencies lift regulatory restrictions on their competitors").

This harm is directly traceable to Defendants' Third Mass Cancellation Rule.  By creating a new program where borrowers expect to receive cancellation of principal and accumulated absent any special considerations or conditions, Defendants have drastically reduced the attractiveness of borrowing from other lenders, including the state-owned Bank of North Dakota.  This would not have happened but for Defendants' unlawful Third Mass Cancellation Rule.  An order of this court staying or enjoining and vacating the Third Mass Cancellation Rule would redress the harms to North Dakota's competitive business interests.

### C.  The Third Mass Cancellation Rule injures the States' financial interests in collecting tax revenues on forgiven student loans.

Plaintiff States face another form of financial harm from the Third Mass Cancellation Rule.  In Missouri, Georgia, North Dakota, and Ohio, an individual's taxable state income is based on their federal taxable income or federal adjusted gross income ("AGI") as a baseline.  See O.C.G.A. § 48-7-27(a); Mo. Rev. Stat. § 143.121; N.D.C.C. § 57-38-30.3(2); O.R.C. § 5747.01.  Doing so greatly simplifies filing and decreases confusion for taxpayers.  It also typically increases state revenue when loans are forgiven (other than through the Public Service Loan Forgiveness program) because the amount of loan forgiveness normally is added to a taxpayer's federal AGI, increasing that person's tax liability.  *See* 26 U.S.C. § 61(a)(11).

That will not be true, however, through 2025.  Under the American Rescue Plan Act of 2021, the discharge amount will be *excluded* for student loan debts discharged before January 1, 2026.  § 108(f)(5).  But for the Third Mass Cancellation Rule, significant numbers of federal loan cancellations would occur after 2025 and would result in taxable income being recognized from the loan forgiveness and thus increased payments of income taxes to Missouri, Georgia, North Dakota, and Ohio.  That means the Third Mass Cancellation Rule will deprive these States of revenue they otherwise would have obtained.  These harms are sufficient to establish an injury-in-fact for Article III standing.  *See Wyoming v. Oklahoma*, 502 U.S. 437, 448, 454 (1992) (standing where a State experiences "loss of specific tax revenues").

These financial harms are directly traceable to the Third Mass Cancellation Rule.  For millions of borrowers, the Third Mass Cancellation Rule accelerates loan forgiveness, shifting it into the American Rescue Plan Act's tax-free period.  Indeed, the Third Mass Cancellation Rule will result in immediate discharge of loans for borrowers whose loans are older than 20 or 25 years. This would not have happened but for the Third Mass Cancellation Rule.  As for redressability, an order of this court staying or enjoining and vacating the rule would prevent Defendants from unlawfully accelerating forgiveness into the tax-free period.

### III.    The States Are Likely to Succeed on the Merits.

Although the States need only establish a "fair chance of succeeding on the merits," *N. Am. Med. Corp. v. Axiom Worldwide, Inc*., No. 1:06-CV-1678-JTC, 2007 WL 9752026, at *10 (N.D. Ga. Mar. 30, 2007), Plaintiff States have established much more.  Plaintiff States are likely to succeed on their claims that (1) the Third Mass Cancellation Rule violates the major questions doctrine, (2) the Third Mass Cancellation Rule exceeds Defendants' statutory authority, (3) the Third Mass Cancellation Rule is arbitrary and capricious, and (4) the Third Mass Cancellation Rule was promulgated in violation of statutory procedures.

### A. The Third Mass Cancellation Rule violates the major questions doctrine because the Secretary cannot identify "exceedingly clear language" authorizing the Secretary to cancel hundreds of billions in student loans.

Plaintiff States are likely to prevail on Count I because the Third Mass Cancellation Rule flouts the "major questions doctrine."  Under that doctrine, agency action involving a matter of "vast economic and political significance" will stand only if the agency identifies "exceedingly clear language" authorizing its actions. *Alabama Assn. of Realtors*, 594 U.S. at 764; *see also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (requiring "clear congressional authorization" rather than a "plausible textual basis").  This doctrine rests on the premise "that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 722 (cleaned up).  The Supreme Court applied this doctrine last year to strike down Defendants' first unlawful mass cancellation program, *Biden v. Nebraska*, 143 S. Ct. at 2375, and the Eighth Circuit applied the same just last month to enjoin Defendants' second unlawful mass cancellation program, *Missouri*, 2024 WL 3738157, at *2–3.  The doctrine compels the same result here.

### i. The Third Mass Cancellation Rule triggers the major questions doctrine because it concerns issues of great economic and political significance.

The Supreme Court's holding last year in *Biden v. Nebraska* compels the conclusion that Defendants' latest attempt at mass debt cancellation triggers the major questions doctrine.

Start first with great economic significance.  Three years ago, the Supreme Court found that a regulatory price tag loosely estimated at $50 billion was much more than sufficient to trigger the major questions doctrine. *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489.  Here, even in underestimating the cost of the provisions through accounting gimmicks, the Defendants' Third Mass Cancellation Rule is expected to cost three times that number.  In fact the "one-time" cancellation of balances that exceed the original principal on loans is by itself expected to cost at least $73 billion.  89 Fed. Reg. 27,566.  That will occur practically overnight under this rule.

Further, because the rule systematically undercounted the estimated cost by excluding the costs of cancellations that were expected under the now-enjoined SAVE Plan, the true cost approaches that of both the first and second mass cancellation attempts.  Moreover, the major questions doctrine concerns not only the immediate cost, but the cost of the full "breadth of the authority that the agency has asserted."  *West Virginia*, 597 U.S. at 721 (cleaned up).  Because the Third Mass Cancellation Rule asserts authority to cancel "all or part of any" student loan, 89 Fed. Reg. 27,565, the Secretary has asserted authority in excess of a trillion dollars—even if he has chosen to exercise that authority to cancel "only" at least $150 billion right now.  The Third Mass Cancellation Rule is thus "staggering" as a matter of binding precedent.  *Biden v. Nebraska*, 143 S. Ct. at 2373.

The same is true of "political" significance.  If mass loan forgiveness had "staggering" political significance last year—as the Supreme Court held—it obviously still does today.  "'More than 80 student loan forgiveness bills and other student loan legislation' were considered by Congress during its 116th session alone."  *Biden v. Nebraska*, 143 S. Ct. at 2373 (citation omitted).  Student loan debt cancellation is a highly salient political topic "that Congress would likely have intended for itself."  *Id*. at 2375.

### ii. The HEA includes no "clear statement" authorizing the breadth of power asserted in the Third Mass Cancellation Rule.

Because the Third Mass Cancellation Rule triggers the major questions doctrine, the agency action must fall unless the agency can identify "a clear statement" in a statute that gives "clear congressional authorization" to the Secretary.  *Id.* at 2375.  And not just that.  The clear statement must justify the full "breadth of the authority that the agency has asserted."  *West Virginia*, 597 U.S. at 721 (cleaned up); *see also BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 617 (5th Cir. 2021) ("assertion of virtually unlimited power" raised separation of powers principles concerns over agency mandate.).

Here, the Secretary has asserted limitless authority to cancel "all or part of any" student loan at his sole discretion—even at the moment a borrower graduated.  Defendants have come nowhere close to identifying "exceedingly clear language" authorizing its actions.  *Alabama Assn. of Realtors*, 594 U.S. at 764.

The Secretary cannot even identify relevant text in the Direct Loan program.  All he does is rely on text from the now-defunct FFEL private loan program, which gives the Secretary authority to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption" in the FFEL private program.  HEA § 432(a), 20 U.S.C. § 1082(a)(6).  There is no similar text in the Direct Loan program.  In fact, the Secretary recognizes that his textual hook is so weak that he feels forced to resort to "legislative history."  89 Fed. Reg. 27,566 n.4.  The major questions doctrine requires identifying crystal clear text, not inferences from unreliable legislative history.

Even if this text from the FFEL program did apply to the Direct Loan program, it would be insufficient.  This waive-or-compromise language is strikingly similar to the "waive or modify" language from the HEROES Act that the Supreme Court already held was not clear enough to justify a mass cancellation program like this.  Indeed, both statutes use the same term "waive," and the other terms in the FFEL statute (enforce, pay, compromise, and release) must be interpreted similarly to "waive" because of the canon that holds "that a word is given more precise content by the neighboring words with which it is associated."  *United States v. Dawson*, 64 F.4th 1227, 1237 (11th Cir. 2023) (citation omitted).  Because the HEROES Act language did not satisfy the major questions doctrine, neither can the (in some places identical) FFEL language.

Similarly, the Third Mass Cancellation Rule relies on a dubious interpretation of 31 C.F.R. § 902 and 31 U.S.C. § 3711, that would allow the Secretary, at his sole discretion, to disregard the

joint Department of Treasury and Department of Justice regulatory scheme governing federal "compromise authority."  But Defendants' cannot identify "exceedingly clear language" granting this discretion either.  To the contrary, as discussed in more depth in Part III.B below, both 31 C.F.R. § 902 and 31 U.S.C. § 3711 place clear guardrails on instances when an agency may exercise "compromise authority" over debts owed to the agency.  Aside from those instances, Section 3711 mandates an agency head "collect a claim of the United States Government for money . . . arising out of the activities of, or referred to, the agency."  31 U.S.C. § 3711.  Yet, the Defendants' Third Mass Cancellation Rule authorizes the Secretary to dismiss the statute and grant broad waivers without any attempt to collect the claim on that money.

Further, while an interpretation need not be unprecedented to violate the major questions doctrine, *Assn. of Realtors*, 594 U.S. at 760 (striking down the 5th eviction moratorium), departure from longstanding practice is strong evidence the agency is acting without Congressional authorization, *see Biden v. Nebraska*, 143 S. Ct. at 2372 ("The Secretary has never previously claimed powers of this magnitude under the HEROES Act."); *Nat'l Fed'n Indp. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022).  As discussed in more depth below in Part III.C, the Secretary has never interpreted section 432(a) authority to permit forgiveness of all or part of any loan balances (principal or interest) in the Direct Loan Program.  To the contrary, in 2021, the Department expressly disclaimed the interpretation that Defendants press here.  *See* Reed Rubinstein Memo, at 2–4.  There, the Department stated "it is impossible to escape the conclusion that Congress funds student loans with the expectation that such loans will be repaid in full with interest, except in identified circumstances" not relevant here and that the Secretary's current interpretation would transfer the Secretary's authority into an unconstitutional "dispensing power."  Compl. Ex. A at 6.  The memo further stated that "the far outer boundary" of the

Secretary's authority is "case-by-case" and "partial" waiver—and even then "only to the extent of providing an interest credit for a defined time period." *Id.* at 4 & n.3. By definition, there can be no "exceedingly clear language" authorizing a program if the Department itself has expressly disclaimed that interpretation—much less if the Department, the President, former Speaker Pelosi, and Congress are all on record rejecting this interpretation.

For the third time in two years, the Secretary is trying to effectuate "fundamental revision of the statute" from one program to another. *West Virginia*, 597 U.S. at 701 (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994)). The Court should reject that interpretation. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism." (internal citation and quotation marks omitted)). Unlike more limited waivers to settle litigation in *Sweet v. Cardona* (which were still suspect under the HEA), Defendants in the Third Mass Cancellation Rule have "purported to use the HEA authority in a manner that would expand the jurisdiction of the Department." 3:19-cv-03674-WHA, Dkt. No. 332, *Defendants' Consolidated Reply in Support of Motion for Final Approval of Settlement* (N.D. Cal. Oct. 17, 2022).[10] This they cannot do.

Congress did not provide the Department with clear authorization under the HEA to undertake these actions. The Third Mass Cancellation Rule is an open-and-shut violation of separation of powers principles under the major questions doctrine.

---

[10] https://storage.courtlistener.com/recap/gov.uscourts.cand.344091/gov.uscourts.cand.344091.332.0.pdf

**B.  The Third Mass Cancellation Rule is in excess of statutory authority.**

Even if the major questions doctrine did not apply, Plaintiff States are likely to prevail on their claim that the Third Mass Cancellation Rule is in excess of statutory authority.  Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity, or "in excess of statutory . . . authority[,] . . . limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).  Applying "ordinary tools of statutory interpretation," *Biden v. Nebraska*, 143 S. Ct. at 2375, the statute does not permit the actions taken by the Third Mass Cancellation Rule.  This is true for at least five main reasons.

**1.** Begin first with binding precedent.  The Supreme Court has already construed the Secretary's forgiveness authority and determined "Congress opted to make debt forgiveness available *only* in a few particular exigent circumstances."  *Biden v. Nebraska*, 143 S. Ct. at 2369 (emphasis added).  The Secretary, in sharp contrast, asserts carte blanche authority to forgive "all or part of any" student loans.  89 Fed. Reg. 27565.  That assertion is fundamentally inconsistent with how the Supreme Court has already interpreted the Secretary's authority.

**2.** Section 432(a) does not authorize the Secretary to waive loans or interest in the Direct Loan program.  It does not apply to the Direct Loan program *at all*.  Section 432(a), 20 U.S.C. § 1082(a), provides for the Secretary's "General Powers" under the FFEL private loan program.  Under subsection (a)(6), "with respect to, the functions, powers, and duties, vested in him," the Secretary is authorized to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption."  20 U.S.C. § 1082(a)(6).

The federal Direct Loan program does not have a parallel provision.  Instead, the Third Mass Cancellation Rule asserts that section 432(a)(6) can be incorporated into the Direct Loan

program though Section 451(b)(2) of the HEA.  There are two fundamental problems with this argument.

First, and most striking, section 451(b)(2), on its own terms, specifically references *only* Section 428, not section 432.  *See* 20 U.S.C. § 1087a(b)(2) ("loans made to borrowers under this part that, except as otherwise specified in this part, have the same terms, conditions, and benefits as loans made to borrowers under section 428 [codified at 20 U.S.C. § 1078].").  So the Direct Loan program does not even incorporate the FFEL language that the Secretary needs.

Second, even if the Direct Loan program incorporated FFEL language, it would incorporate only the "terms, conditions, and benefits" of the FFEL program.  20 U.S.C. § 1087a(b)(2).  But as the Department previously concluded, "the Secretary's general power to compromise or waive claims under the FFEL program is neither a term nor a condition nor a benefit of FFEL program loans."  Reed Rubinstein Memo, at 4 n.3.  The "terms, benefits, and conditions" refer to things like the repayment period, the statutory interest, and the ability to apply for forbearance.  We know this because another provision in the Higher Education Act, § 1087e(a)(1), expressly incorporates the "terms, conditions, and benefits" of the FFEL program and states that those terms, conditions, and benefits are found in §§ 1078, 1078-2, 1078-3, and 1078-8.  None of these sections have the waive-or-compromise language the Secretary is looking for.  Instead, they deal with actual terms, conditions, and benefits, such as whether interest on loans will be subsidized.  *E.g.*, § 1078.  The Secretary's general authority in the FFEL program to waive or compromise is not a "term," "condition," or "benefit" of an individual loan, and to interpret this phrase as such would stretch its meaning well beyond reasonable bounds.

Moreover, the language of section 432(a) is clear that any power to "compromise, waive, or release" a claim is cabined in a requirement that such an action be "with respect to, the functions,

powers, and duties, vested in him."  To the extent that the Secretary has any power to "compromise, waive, or release" student debt, he may do so only if Congress has *elsewhere* given him a specific power or duty to do so.  No such authorization exists here.  Just as "Congress has made it clear under what circumstances loan forgiveness is permitted, and the ICR plan is not one of those circumstances," *Missouri*, 2024 WL 3738157, at *3, so too the FFEL "waiver" language is not one of those.

The Third Mass Cancellation Rule ignores these clear limitations, and instead asserts that "compromise, waive, or release" language provides the Secretary to "waive all or part of any loan." This broad interpretation is contradicted by the Supreme Court's ruling in *Biden v. Nebraska,* where the Court held that similar "waive" language in the HEROES Act did not authorize the Secretary to "rewrite that statute from the ground up."  *Biden v. Nebraska*, 143 S. Ct. at 2368. "Congress opted to make debt forgiveness available only in a few particular exigent circumstances; the power to modify does not permit the Secretary to 'convert that approach into its opposite.'" *Id.* at 2370 (citing *Descamps v. United States*, 570 U.S. 254, 274 (2013)).

**3.** The Secretary's interpretation is especially flawed because it makes a mockery of the many loan forgiveness provisions that Congress expressly created.  "When Congress includes particular language in one section of a statute but omits it from a neighbor," the Supreme Court has held, "we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023).  Here, Congress has meticulously created many loan forgiveness programs—*e.g.*, IBR, Public Service Loan Forgiveness, five-year loan forgiveness for teachers.  In fact, Congress spent years carefully negotiating the eligibility and forgiveness amounts for the IBR program, with Congress enshrining the initial program in 2007 and then heeding President Obama's call in 2010 to make it more generous.  20 U.S.C. § 1098e.

Under the Secretary's interpretation, all this negotiation between Congress and the President just wasted massive amounts of time and energy. "What chumps!" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 825 (2015) (Roberts, C.J., dissenting). "Didn't they realize that all they had to do was" forgive whatever they wanted at the stroke of a pen? *Id.* Of course not. When Congress specifically articulated a number of forgiveness provisions in the Higher Education Act, it did not simultaneously give the Secretary a trump card to "waive all or part of any" loan—contrary to what the Secretary now asserts. 89 Fed. Reg. 27,565.

For these reasons, the Department reasonably concluded in 2021 that the Secretary's general waiver authority cannot overcome the "more specific Title IV provisions requiring repayment and providing for cancellation, compromise, discharge, forgiveness, or modification only in limited circumstances." Rubinstein Memo at 3. To hold otherwise would violate the "general/specific canon," under which "a general authorization" must be narrowly construed when there is "a more limited, specific authorization" in order to avoid "superfluity of [the] specific provision." *Id.* at 3–4 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). At the very least, the canon of constitutional avoidance prohibits reading the statute the way the Secretary does because it would convert the Secretary's limited authority into an unconstitutional "dispensing power," *id.* at 7, violation the Power of the Purse and the Nondelegation Doctrine.

The Third Mass Cancellation Rule's provision on full forgiveness for undergraduate borrowers after 20 years and graduate borrowers after 25 years provides a helpful example. By creating this provision, Defendants attempt to establish a backdoor universal IBR forgiveness program. As discussed above, the IBR program is the only program that provides forgiveness

based on a person's income; it does so after 20 to 25 years of payments. *See* 20 U.S.C. § 1098e(b)(7). But it has eligibility criteria that Congress carefully negotiated and enacted into statute. Here, Defendants seek to enable borrowers to evade the eligibility requirements that Congress enacted into law. "Congress opted to make debt forgiveness available only in a few particular exigent circumstances," but under the Secretary's new rule, "[n]o prior limitation on loan forgiveness is left standing." *Biden v. Nebraska*, 143 S. Ct. at 2368–69.

**4.** The Third Mass Cancellation Rule also exceeds statutory authority because 31 U.S.C. § 3711 and 31 C.F.R. § 902 are binding on the Secretary, and the new rule disclaims that requirement. Section 3711 requires the Secretary to "try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to the agency," and requires he "act[] under . . . standards that the Attorney General, the Secretary of the Treasury, may prescribe." 31 U.S.C. §§ 3711(a)(1), (d)(2). The Attorney General and Secretary of the Treasury's standards are set forth in 31 C.F.R. § 902. That regulation prescribes that the Secretary may only compromise a debt in certain circumstances.

Specifically, the claims collections standards provide that a government agency may compromise a debt of under $100,000 only where the agency establishes that it "cannot collect the full amount because (1) The debtor is unable to pay the full amount in a reasonable time, as verified through credit reports or other financial information; (2) The Government is unable to collect the debt in full within a reasonable time by enforced collection proceedings; (3) The cost of collecting the debt does not justify the enforced collection of the full amount; or (4) There is significant doubt concerning the Government's ability to prove its case in court." 31 C.F.R. § 902. Those are individualized determinations, not amenable to classwide waiver powers. The provisions of the Third Mass Cancellation Rule exceed those circumstances, and instead proclaim authority for

broad-based compromises on any and all student loan balances.  If Congress intended these provisions to permit the Government to forgive all loans, Congress would not have created carefully reticulated loan forgiveness programs.

Moreover, Defendants beyond unlawfully forgiving loans, Defendants also intend to backdate the "effective date" for loans forgiven pursuant to the 20/25 year provision to June 1, 2024, and then refund any payments made during that period.  *See* Compl. Ex. H.  Thus, not only is the Secretary violating his duty to collect claims owed to the United States, but he also intends to force taxpayers to refund student loan borrowers for payments already made.

**5.** The rule also exceeds statutory authority because the Secretary has no authority to force the rule into effect now.  Regulations affecting programs under title IV of the HEA cannot take effect until July 1 of the following year.  *See* 20 U.S.C. § 1089(c)(1).  The Secretary tries to evade this by invoking a provision giving the Secretary discretion to "designate any regulatory provision that affects the programs under this subchapter and is published in final form after November 1 as one that *an entity subject to the provision* may, in the entity's discretion, choose to implement prior to the effective date in [section 1089(c)(1)]."  *Id.* § 1089(c)(2)(A) (emphasis added).

The Secretary cannot invoke this provision because the Secretary and the Department are not "entit[ies]" for purposes of the HEA—or at least they are not the only entities.  The "entities" are organizations like MOHELA, and under the text, they have "discretion" not to implement any terms before July 1, 2025.  But the Secretary has unlawfully demanded that MOHELA and other servicing companies do so immediately.  For example, the Change Request form demands that servicing organizations "*shall* begin processing the Measure 1 forgiveness file *immediately* upon receipt" of "forgiveness files" from the Department and "*shall* complete all Measure 1 forgiveness processing, to include sending borrower notifications, within 10 business days" after receipt.

Compl. Ex. D at 4 (emphasis added).  At the very least, the Secretary cannot divest MOHELA and other servicing organizations of their "discretion" not to implement the regulation early.

### C.  The Third Mass Cancellation Rule is arbitrary and capricious.

Plaintiff States are also likely to prevail on their claims that the Third Mass Cancellation Rule is arbitrary and capricious, and thus in violation of the APA.  The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

An agency action is arbitrary or capricious if, among other things, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), or otherwise did not "engage[] in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  At base, the "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commun. Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Here, Defendants' Third Mass Cancellation Rule is arbitrary and capricious for many independent reasons:

**1.** The Third Mass Cancellation Rule is an attempt at an end-run around the Eighth Circuit's injunction against the SAVE Plan.  That injunction bars Defendants from implementing the SAVE Plan for individuals wholly or partly enrolled in that program. *Missouri*, 2024 WL 3738157.  Three different courts have ruled that the SAVE Plan is unlawful.  Yet Defendants are trying to use the Third Mass Cancellation Rule to give individuals who are *not* enrolled in the SAVE Plan the benefits of that Plan even though the Plan is already enjoined for everybody who *is* enrolled in it. The Eighth Circuit was forced to intervene when Defendants tried a similar gambit in July. *Id.* at *2 ("Despite the district court's injunction, the Government continue[d] to forgive loans for borrowers enrolled in SAVE" through a "new so-called 'hybrid rule'" that "render[s] that

injunction a nullity").  The Secretary cannot use this rule to give borrowers the benefit of a different rule that is currently under an injunction.

**2.** There is a dispute among courts about whether the Congressional Review Act's 60-day deadline is enforceable, and the States are prepared to offer more briefing on that issue if the Court grants a TRO and considers preliminary injunctive relief later.  But at the very least, the rule plainly violates that Act, and it is arbitrary and capricious for Defendants to surreptitiously design this rule to evade judicial and congressional review.  There is no plausible emergency or anything else that would require the Secretary to deviate from the ordinary norm of not implementing any rule until at least 30 to 60 days after publication.  This is the *third* attempt Defendants have made at mass cancellation.  There is no legitimate urgency, only a manufactured urgency in trying to forgive as much debt as possible as quickly as possible in election year because they know "the States cannot turn back the clock on any loans that have already been forgiven." *Missouri*, 2024 WL 3738157, at *4.

**3.** The Third Mass Cancellation Rule fails to capture, account for, or report the full cost of its implementation.  The Third Mass Cancellation Rule estimated the provisions would cost $146.9 billion.  This estimate, however, is based on the Defendants' assumption that they would prevail in *Missouri v. Biden* and the SAVE plan would be implemented.  Because the SAVE plan remains fully enjoined, and Defendants are prohibited from further forgiving loans under many income-driven plans, the universe of borrowers for which this Rule applies is now significantly higher.

Particularly, where Defendants are now enjoined from implementing their unlawful SAVE Plan forgiveness, borrowers with undergraduate loans dating back before July 1, 2005, and post-graduate loans date back before July 1, 2000, who are otherwise eligible for the SAVE plan could now receive full forgiveness under this plan.  The cost estimates within the Third Mass

Cancellation Rule do not account for this change, and thus seriously underestimate the total cost of the Third Mass Cancellation Rule.

Worse yet, the Third Mass Cancellation Rule is being implemented *after* two district courts and the Eighth Circuit enjoined the SAVE rule.  The Defendants were thus on full notice that their cost estimates were least woefully inadequate.  For example, in a bit of accounting sleight of hand, Defendants have admitted that borrowers who were expected to receive forgiveness under the SAVE Rule, and who would also receive waivers under this plan were "not assign[ed] a cost to the waivers."  *See* 89 Fed. Reg. 27,605.  In other words, where the vast majority of borrowers under the SAVE Rule were expected to receive forgiveness, the Third Mass Cancellation Rule does not consider any waivers for those borrowers as a cost.  That *drastically* undercounts the current costs of this program, considering Defendants' efforts toward immediate implementation of these waiver provisions.  Moreover, where the SAVE rule has been enjoined, all of those waiver costs should have been considered primary costs of this rulemaking and thus included in the estimated figures.  Beyond these obvious costs, the Secretary's assertion of unlimited power to waive "all or part of any" loan owned by the Department extends the potential cost to include every dollar now held by the Department, well north of $1 trillion.

**4.** The rule is arbitrary and capricious for all the additional reasons laid out in the complaint, which the States can brief at the appropriate time, including (1) that it did not consider States' financial interest on tax revenue from loan forgiveness, (2) that it changes course from decades of Department practice on loan authority, and (3) that it failed to consider meaningfully the inflationary effects of the Third Mass Cancellation Rule.

**D. The Third Mass Cancellation Rule was promulgated in violation of statutory procedures.**

Plaintiff States are likely to succeed on their claim that the Third Mass Cancellation Rule violates the APA because it was promulgated in violation of statutory procedures.  The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. §§ 553(b), (c).  "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs*., 587 U.S. 566, 582 (2019).

Here, the Proposed Rule had a limited comment period of just 30 days.  *See* 89 Fed. Reg. 27,564.  "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable minimum time for comment.'"  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (quoting Admin. Conf. of the U.S., *A Guide to Federal Agency Rulemaking* 124 (1983)).

The short 30-day comment period was patently insufficient in light of the complexity and staggering significance of the Third Mass Cancellation Rule.  "A sixty-day period [w]as a more reasonable minimum time for comment," *id.* (internal quotes omitted), because the Secretary has asserted "authority to waive all or part of any" loan, 89 Fed. Reg. 27,565.  As discussed above, the Third Mass Cancellation Rule wades into issues of major economic and political significance, with an estimated cost in excess of $140 billion.  At a minimum, the Third Mass Cancellation Rule

commits to spending more than one and a half times the Department's FY 2024 discretionary budget request[11] on these provisions over just the span of a couple days.

Moreover, compounding the exorbitant cost estimates, the Third Mass Cancellation Rule concerns novel interpretations of the HEA that require delicate consideration to avoid constitutional pitfalls.  A short comment period fails to adequately accommodate necessary and fulsome participation of interested parties.  Past administrations have recognized this reality and published executive orders instructing agencies to provide sixty days of commenting as the default. *See* 58 Fed. Reg. 51,735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which *in most cases should include a comment period of not less than 60 days*." (emphasis added)); 76 Fed. Reg. 3821–22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that *should generally be at least 60 days*." (emphasis added)).

While the Proposed Rule asked for the public's help in "complying with the specific requirements of Executive Orders 12866, 13563, and 14094 and their overall requirement of reducing regulatory burden that might result from these proposed regulations," 89 Fed. Reg. 27,566, it did not offer the public the 60-day commenting period called for in those orders.  By providing only thirty days, Defendants' Third Mass Cancellation Rule was promulgated without observance of procedure and thus violated the APA.

### IV.    Plaintiff States Face Irreparable Harm.

Absent immediate relief, Defendants will unlawfully cancel as much as $73 billion in student loans as soon as this week, with at least another $80 billion in continuing forgiveness each

---

[11] https://www2.ed.gov/about/overview/budget/budget24/summary/24summary.pdf

day thereafter.  89 Fed. Reg. 27,565–66.  As the Department's communications with loan servicers make clear, Defendants expect that all of the rule's forgiveness measures are fully executed within three days.  Compl. Ex. E ("8/21/2024 MOHELA Email").  MOHELA will be deprived permanently of all administrative servicing fees it would have received from accounts being closed or balances on accounts being reduced.  The Eighth Circuit has twice concluded that this kind of harm is irreparable, and the Supreme Court has twice rejected Defendants' assertions otherwise. *E.g.*, *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157, at *4 ("The States cannot turn back the clock on any loans that have already been forgiven."); *Nebraska v. Biden*, 52 F.4th 1044, 1047 (2022) (loan forgiveness has an "irreversible impact.").

Eleventh Circuit precedent also supports the States.  Irreparable harm exists where no "adequate compensatory or other corrective relief will be available at a later date."  *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).  "If Plaintiff incurs monetary losses as a result of an unlawful exercise of government authority, no avenue exists to recoup those losses because the [Government] has not waived its sovereign immunity from suits seeking these sorts of damages."  *Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty., Georgia*, 540 F. Supp. 3d 1291, 1318 (S.D. Ga. 2021) (citing *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013)); *see also* 5 U.S.C. § 702 (providing for an action seeking relief "other than money damages").

The rule harms the Plaintiff States for additional reasons.  In Plaintiff States that rely on federal AGI, every single dollar forgiven for borrowers in their states ordinarily would have been taxed but cannot because of this rushed forgiveness.  And apart from MOHELA's role as a servicer of student loans, it also obtains interest revenue from older FFEL private loans.  When individuals refinance their FFEL private loans into Direct Loans to take advantage of this rule (as they have

done the last two times Defendants attempted mass forgiveness) that irreversibly deprives MOHELA of interest revenue.  Refinanced loans cannot be unwound.  North Dakota is harmed for similar reasons.  "[C]ompetitive injuries . . . are difficult to quantify" and can serve as the basis of irreparable harm.  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).  Like the financial harms above, the competitive harm genie cannot be put back in the bottle.  North Dakota will never recoup revenue lost from the Federal Government unlawfully inducing borrowers into Direct Loans and away from North Dakota's loan programs.

In 2022, Defendants voluntarily agreed not to implement the first attempt at mass cancellation while waiting for the district court to adjudicate the preliminary injunction motion. *Nebraska v. Biden*, No. 4:22-cv-01040, ECF 14 (Sept. 30, 2022).[12]  They cannot plausibly claim any harm from having to do the same here.

## V.    The Balance of Harms and Public Interest Favor the Plaintiff States.

This balance of harms and public interest heavily favors granting relief.  These two factors "merge" when a plaintiff seeks injunctive relief against the government.  *Nken*, 556 U.S. at 435. As described above, Plaintiff States face irreparable harm if the Third Mass Cancellation Rule is permitted to go into effect.  And because the Defendants seek immediate execution of at least $73 billion in forgiveness, that harm will be turbocharged if the rule is allowed to be implemented for even a few days.

In contrast, the only potential harm to Defendants is a brief pause in implementation—and such harm would be true only in the unlikely event Defendants ultimately prevail.  A stay, temporary restraining order, or preliminary injunction will freeze the status quo as it currently exists before the Defendants forgive tens, if not hundreds, of billions of dollars of student loan

---

[12] https://storage.courtlistener.com/recap/gov.uscourts.moed.198213/gov.uscourts.moed.198213. 14.0_2.pdf

debt that cannot be recovered.  "It will not harm the federal government to maintain the status quo while the courts decide the issues of the President's authority."  *Missouri v. Biden*, 576 F. Supp. 3d 622, 635 (E.D. Mo. 2021).

The public interest also heavily favors a § 705 stay, a TRO, and a preliminary injunction. The Third Mass Cancellation Rule seeks to impose a huge windfall on the comparatively small proportion of Americans holding student loan debt (about 13%) while imposing a gargantuan price tag on all Americans and shortchanging the legislative process.  Though Defendants assert that the Third Mass Cancellation Rule advances interests of borrowers in reducing and eliminating their student loan debt, "the government may not 'act unlawfully even in pursuit of desirable ends.'" *Missouri v. Biden*, 576 F. Supp. 3d at 635 (citing *Alabama Ass'n of Realtors*, 594 U.S. at 766). "[T]he public has no interest in enforcing what is likely unconstitutional regulations." *Brantley Cnty*, 540 F. Supp. at 1319 (citing *Odebrecht Const., Inc.*, 715 F.3d at 1290).  Instead, "the public's true interest lies in the correct application of the law."  *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).  Here, that requires a determination, on the merits, of whether the Defendants' Third Mass Cancellation Rule violates the APA.  Up and until that decision, the public interest favors a stay, TRO, and a preliminary injunction.

Finally, the Secretary's actions have been extraordinarily inequitable.  This is the *third* lawless attempt by the Secretary to mass forgive student loans—really, the fourth if one includes the "hybrid" plan he created over the summer that the Eighth Circuit promptly enjoined. Defendants have gone to extraordinary lengths to keep this quiet so that forgiveness would occur before anybody could sue.  And the Secretary is also expressly using this program for electioneering purposes.  The Secretary has prewritten an email and instructed MOHELA and other servicing organizations to send out that email when forgiving loans.  In relevant part, the top

of the mandated email reads "Congratulations! The Biden-Harris Administration has forgiven a portion of your federal student loan(s) listed below with [SERVICER NAME]."  Compl. Ex. J at 1 (brackets in original).  The explicit reference to the "Biden-Harris Administration" at the very top of the mandated email is a transparent attempt to electioneer two months before the Presidential election.

## VI.    A Complete Administrative Stay or Temporary Restraining Order Are Necessary to Ensure Complete Relief.

The Court should issue relief against the rule in its entirety, and not allow the rule to be implemented in other States.  As the Eighth Circuit has twice concluded, relief that broad is necessary to ensure the Plaintiff States obtain full relief.

While the Supreme Court has recently looked askance at "universal injunctions" crafted *broader* than necessary to provide relief to the plaintiffs, the Supreme Court has not questioned the well-established rule—very common, for example, in nuisance actions—that relief can extend incidentally to nonparties if necessary to provide complete relief to the plaintiff. *Cf., Gill v. Whitford*, 585 U.S. 48, 67 (2018) ("[T]he only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale 'restructuring of the geographical distribution of seats in a state legislature.'" (citation omitted)).

As the Eighth Circuit has twice concluded, that kind of relief is necessary for MOHELA given the nature of its industry.  Last month, the Eighth Circuit granted relief against the SAVE Plan in its entirety and did not let the plan go into effect in other States because the Court concluded that was the only way to "craft an injunction that is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'"  *Missouri*, 2024 WL 3738157 at *4. Narrower relief is not possible because of the national, dynamic student loan industry, which is serviced by just a handful of organizations.  MOHELA services more than 8 million accounts, with

a portfolio of more than $300 billion in federal direct loans and accounts in every State. These accounts are dynamic. For example, in 2022, about two million accounts were transferred from one servicer to MOHELA. Earlier this year, about 1.5 million were transferred out. To limit the scope of relief to accounts presently held by MOHELA would be to permit the Secretary to evade any injunction simply by transferring accounts. "Given MOHELA's national role in servicing accounts, [there is] no workable path in this emergency posture for narrowing the scope of relief. And beyond Missouri, tailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022).

Moreover, should the Court allow the Third Mass Cancellation Rule to go into effect elsewhere (through other servicers), before the rule is permanently enjoined as an unlawful exercise of authority, MOHELA will suffer untold reputational harms from borrowers who did not receive the unlawful cancellation while other borrowers did.[13] MOHELA competes for a share of the national student loan portfolio, and shares are awarded based on customer-satisfaction ratings, so any harm to MOHELA's reputation from artificially narrow relief would harm MOHELA's ability to obtain future accounts. Such irrevocable harm can be avoided through issuance of a universal administrative stay or temporary restraining order whole this Court examines the legality of the Third Mass Cancellation Rule.

Notably, the Eighth Circuit has twice concluded that this broad relief is necessary, and the Supreme Court has twice rejected the Department of Justice's arguments to the contrary. In *Biden v. Nebraska*, the Department of Justice vigorously attacked the Eighth Circuit's grant of what the

---

[13] To be clear, the State of Missouri, not MOHELA, is in charge of deciding whether to sue over this rule. Mo. Rev. Stat. § 27.060. But ordinary consumers are not expected to understand that nuance.

Government called "universal relief."  Application, No. 22A444 at 32–35 (Nov. 18, 2022).  The Supreme Court rejected that argument and struck down the entire program in *Biden v. Nebraska*. Similarly, the Eighth Circuit last month granted similarly broad relief, and the Department of Justice again vigorously attacked the scope of relief.  Application, No. 24A173 at 32–34 (Aug. 13, 2024).  The Supreme Court again, without dissent, rejected that argument.  Order Denying Application (Aug. 28, 2024).

That makes sense not just because broad relief is necessary to make the Plaintiff States whole, but also because this case requests more than just an equitable remedy; it requests a *statutory* remedy.  Regardless of the limits on a court's equitable authority, this Court possesses *statutory* authority to stay the rule in its entirety.  5 U.S.C. § 705 ("When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review.").  Section 705 "confer[s] upon every 'reviewing court' discretionary authority to stay agency action pending judicial review 'to the extent necessary to prevent irreparable injury.'" Clark, Att'y Gen's Manual on the Administrative Procedure Act 105 (1947); *see also In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (section 705 provides "statutory authority to stay agency orders pending review").

As Justice Kavanaugh noted in July, the longstanding recognition that the APA permits action against the rule itself is the only way to make sense of the "[Supreme] Court's landmark decision[s]" in the APA context.  *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve System*, 144 S. Ct. 2440, 2460, 2465 (2024) (Kavanaugh, J., concurring).  Indeed, the Supreme Court regularly vacates rules in their entirety when they violate the APA.  In 2020, the Supreme Court held that the Trump administration's rescission of the Deferred Action for Childhood Arrivals

program "violated the APA," and so the Court determined that the federal action "*must* be

vacated." *DHS v. Regents of the Univ. of Cal.*, 591 U.S 1, 9 (2020) (emphasis added).

> **VII.   If the Court denies Relief, it Should Grant an Administrative Stay or Injunction Pending Appeal to Give the States Time to Seek Emergency Relief in the Appellate Court.**

As explained, absent relief the Secretary will cancel $73 billion or more within a few days.

If this Court rejects the States' claims, the Court should at least enter administrative relief to give

the States time to seek emergency relief in the Eleventh Circuit.  Courts regularly do so.  For

example, last year the Western District of Missouri entered judgment against Missouri (in a case

brought by the Federal Government) but ordered that "Judgment is temporarily administratively

stayed until such time as the U.S. Court of Appeals for the Eighth Circuit rules on Defendants'

expected motion to stay the Order and Judgment pending appeal."  ECF 96, *United States v.

Missouri*, No. 22-cv-04022 (W.D. Mo., Mar. 9, 2023).  The Western District of Missouri did

something similar the year before.  *E.g.*, ECF 68, *Org. for Black Struggle v. Ashcroft*, No. 20-cv-

4184 (W.D. Mo., Oct. 10, 2022) (granting temporary administrative stay for ruling on appeal by

Eighth Circuit).  So at the very least, this Court should stay the agency action or grant a limited

injunction pending appeal, FRAP 8, until the Eleventh Circuit rules on a forthcoming motion.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that this Court grant their

"Motion for a Stay/Preliminary Injunction/Temporary Restraining Order" to prevent the

Defendants' unlawful implementation of the Third Mass Cancellation Rule.  Plaintiff States further

request that the Court grant their Motion with haste given the enormous economic and

consequences of allowing the Third Mass Cancellation Rule to take effect before judicial review.

If the Court grants a TRO, Plaintiff States can further brief all the issues before a later preliminary

injunction hearing.

Date: September 3, 2024

Respectfully Submitted,

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**
Stephen J. Petrany
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

/s/ G. Todd Carter
G. Todd Carter, Esq.
Georgia Bar No: 113601
Special Assistant Attorney General
Office of the Georgia
Attorney General
Brown, Readdick, Bumgartner,
Carter, Strickland &Watkins, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel: 912-264-8544
Fax: 912-264-9667
tcarter@brbcsw.com

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine*
    *Solicitor General*
Reed C. Dempsey*
    *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov
reed.dempsey@ago.mo.gov

*Pro hac vice pending

**STEVE MARSHALL**
**Attorney General of Alabama**

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.*
   *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Pro hac vice pending

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/Nicholas Bronni
Nicholas J. Bronni*
   *Solicitor General*
Dylan L. Jacobs*
   *Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Pro hac vice pending

**ASHLEY MOODY**
**Attorney General of Florida**

/s/James H. Percival
James H. Percival*
   *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Pro hac vice pending

**DREW H. WRIGLEY**
**Attorney General of North Dakota**

/s/ Philip Axt
Philip Axt*
   *Solicitor General*
North Dakota Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

*Pro hac vice pending

**DAVE YOST**
**Attorney General of Ohio**

/s/ T. Elliot Gaiser
T. Elliot Gaiser*
   *Solicitor General*
Mathura J. Sridharan*
   *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Pro hac vice pending