**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**

STATE OF MISSOURI, *et al.*,

        *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

        *Defendants*.

Case No. 2:24-cv-00103-JRH-BWC

# Exhibit 1

# Declaration of James Kvaal

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**

<table>
<tr><td>

STATE OF MISSOURI, *et al.*,

   *Plaintiffs*,

  v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

   *Defendants*.

</td><td>

Case No. 2:24-cv-00103-JRH-BWC

</td></tr>
</table>

**DECLARATION OF JAMES RICHARD KVAAL**

I, James Richard Kvaal, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate:

1.  I am the Under Secretary of Education at the United States Department of Education (Department). My nomination for this position was confirmed by the United States Senate on September 14, 2021, and I was sworn in on September 15, 2021. As the Under Secretary of Education, my responsibilities include the coordination of major policies, programs, and activities related to federal student aid.  This includes, but is not limited to, providing executive oversight of FSA operations.  As such, I am familiar with the Change Management Process, including the change request process regarding our contracts with our loan servicers and default management service provider.  I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

**The Department of Education and Loan Servicers**

2.  To administer its portfolio of student loans relevant to this case, the Department has contracts with six loan servicers: five servicers under Unified Servicing and Data Solution

contracts and one servicer of Perkins loans. In addition, the Department contracts with one default management service provider.

3. These servicers and service provider together manage a portfolio of loans involving over 42 million borrowers and 1.4 trillion dollars.

4. The Department's loan servicers are responsible for, among other tasks, corresponding with borrowers, collecting and processing payments, processing discharges, and tracking loan amounts paid and owed.

5. The Department's contracts with its servicers contain binding terms that govern the servicers' performance obligations.

**The Change Request Process**

6. To begin the process of changing a servicer's contractual performance obligations, the Department includes a specific process in its contracts, including its servicer contracts: the change request process. This process is used to modify the contractual relationship between the Department and servicer, and this process does not itself create legal obligations or required actions for either the Department or servicer regarding a borrower's loan account.

7. The change request process follows several steps:

  a. First, in issuing a change request, the Department identifies changes to the contract it seeks to implement with the servicer.

  b. Next, in response to a change request, the servicers conduct an "Impact Analysis" (IA) that proposes a rough estimate of hours to perform the changes and an implementation plan, including where the proposed changes require significant modification of loan data systems and a test plan to ensure the viability and

effectiveness of the proposed changes. The IA provides insight into potential technical solutions and the estimated costs of implementing the proposed changes.

c.  Next, the Department reviews the IA and discusses the assumptions and levels of effort with the servicers to ensure mutual understanding of the efforts required. Sometimes these discussions result in multiple revisions to the IA and requirements.

d.  Then, the final revised IA is evaluated (and approved or declined) by the Change Management Work Group within the Department through a standardized review process.

e.  Once the IA is approved and funding is committed, the Department requests a cost and updated technical proposal that generally includes the anticipated date by which the contractor will be ready to execute the requirements (referred to in the Change Management Process as an "implementation date"). The proposal is then reviewed, and the Department negotiates with the servicer. The Department may accept, reject, and/or propose additional changes as part of negotiations when it receives the servicer's proposal.

8.  Often, the change request process includes multiple iterations of exchanges of the sort identified above, in which the Department refines its implementation goals and the servicers further assess their capabilities.

9.  If the Department opts to implement a change following the change request process, it memorializes the agreement through a bilateral modification to its contract.

10. At any time during the change request process, the Department may decide not to implement any changes.

11. The change request process allows the Department to determine the extent of the changes to be made and the timing for the implementation of the changes, as well as to negotiate a fair and reasonable price.

12. The change request process generally does not require a servicer to take a particular action with respect to any loan account, even after contract modification is complete. Rather, the servicer must complete various phases of Department review and await further Department instructions before taking action pursuant to a modification, including discharging a loan. Specifically, even after the change request leads to a contract modification:

   a.  The servicer must produce "validation artifacts," which serve to confirm the servicer's ability to execute the contractual changes before those changes are eventually (if ever) implemented on borrowers' accounts. The Department carefully reviews such validation artifacts before determining whether any further steps should be taken. This process usually lasts several weeks.

   b.  The servicer must complete "Inter-System Testing" (IST) to assess their readiness to implement the change request. This is an exchange of mock data files between and among those relevant systems involved in the change request to ensure that each working group involved in loan servicing (whether within the Department or within the servicer) is technically able to send and receive relevant information.

   c.  In the change request the Department sends to servicers at the beginning of the process, *see supra* paragraph 7, the Department identifies an anticipated implementation date and identifies due dates for deliverables or data that a servicer would provide if a contract modification occurs, including results from any testing.

**Change Request 7037 and the Student Debt Relief Notice of Public Rulemaking ("NPRM")**

13. In anticipation of promulgating final rules stemming from its April 2024 Student Debt Relief Notice of Proposed Rulemaking (NPRM),[1] the Department issued (among other change requests) Change Request 7037 ("CR 7037"), which is attached to the complaint as Exhibit D.

14. The Department issued CR 7037 to ensure that its servicers possessed the capability to execute actions necessary to a smooth implementation of the regulations identified in the NPRM, in the event that those regulations were finalized, and only after the Department began to provide production files to them.

15. The Department sent CR 7037 to servicers on May 6, 2024.

16. CR 7037 identifies a series of tasks the Department contemplated requiring servicers to be able to perform as of a target implementation date.

17. The target date for servicers to be able to implement at CR 7037 was September 1 for Measures 1, 2, and 3. These measures referred to different types of debt relief identified in the NPRM. Specifically, Measure 1 refers to forgiveness when the current balance exceeds the original principal balance under proposed 34 C.F.R. §§ 30.81 and 30.82. Measure 2 refers to forgiveness after 20 or 25 years under proposed 34 C.F.R. § 30.83. And Measure 3 refers to forgiveness in situations where the borrower was eligible for forgiveness under an IDR plan but did not apply for an IDR plan, under proposed 34 C.F.R. § 30.84.

18. In general, and in CR 7037 in particular, the dates identified for implementation and testing in a change request are necessarily tentative. In fact, as described at paragraph 7, *supra*, as part of the change request process, servicers are required to provide proposed

---

[1] *See* 89 Fed. Reg. 27564.

implementation dates, and the Department negotiates implementation dates prior to the finalization of any contract modification. The implementation date is frequently changed based on events occurring during the change request process prior to contract modification.

19. The target implementation dates in CR 7037 represent the Department's estimated date by which it intended to require the servicers to be prepared to issue loan forgiveness.  Such estimates are necessary in order to allow the servicers to plan their own operations, and to permit them to make accurate cost estimates.  However, because a contract modification and subsequent instructions from the Department are necessary before any proposed contract changes actually affect borrowers' accounts, an "implementation date" in a change request does not necessarily reflect the date when the Department will actually take action (or even intends to take action) under any eventual contract modification. In the case of CR 7037, the target implementation date represented the Department's initial estimate of when it intended servicers to be able to begin work under the proposed changes, if at all.

20. Similarly, although the phrasing of CR 7037 is stated in the form of requirements for a servicer to follow (including use of the word "shall"), a change request—including CR 7037—in fact simply notifies the servicers of proposed tasks so that the servicers may prepare for and assess the costs of implementing the changes.  That language alone does not, in fact, obligate (or even permit) a servicer to carry out any changes, including, in CR 7037, issuing any forgiveness of loan balances.

21. In addition, the development of systems specified in CR 7037 does not preclude the Department from issuing subsequent change requests to change parameters of the original request as it finalizes any proposed rules stemming from the NPRM, which ultimately

6

could—through a subsequent contract modification—further modify the specific terms for providing forgiveness. In other words, conducting a change request process, along with a subsequent contract modification, is not inconsistent with a genuine deliberative process that takes account of public input and permits flexibility prior to a rule's finalization.

**CR 7037 and the Inter-System Testing process**

22. Consistent with the process identified above, *supra* paragraph 12, CR 7037 envisioned that the servicers would conduct IST to assess their readiness to implement CR 7037.

23. CR 7037 forecast that IST would begin on August 8, 2024. *See* Exhibit D to the Compl. at 1.

24. In fact, IST under CR 7037 began on August 14, with a kick-off call and test plan to set expectations among servicers, as well as to document specific actions to be taken to test each servicer's loan data systems (with due dates).

25. The IST process associated with CR 7037 was delayed several times because of system readiness issues and necessary updates. For example, Exhibit E shows a communication sent from the Department to servicers notifying them of a forthcoming updated IST schedule and instructing them to complete certain tests within three days of receiving test discharge files.

26. CR 7037 identifies (at page 2) dates on which the Department anticipated requiring testing results, including User Acceptance Testing (UAT) documentation, a sample operational report, a draft borrower notification (to ensure compliance with a Department-provided template), and a statement indicating the servicer's compliance with the Department's requirements (to demonstrate its ability to implement an eventual change).

27. Exhibit G to the Complaint is an example of a communication between the Department and servicers amid IST during a change request. The email shows that the Department

7

intended to require servicers to adhere to the testing deadlines it had originally set, in anticipation of the publication of a final rule later this year.

**Terminology and Department Communications:**

28. Many of the terms used in CR 7037 and the Department's exchanges with servicers have specific technical definitions and carry a particular meaning in the context of the change request and contract modification process. For example:

    a. The term "artifacts," as seen on page 2 of CR 7037, refers to the results of tests and other documentation the Department requests during and after the servicer system development to ensure changes are in accordance with the change request process.

    b. Servicers share IST results through the Student Aid Internet Gateway (SAIG, referred to on page 4 of CR 7037), one of the secure file-sharing systems used by the Department.

    c. "PRR" as used in the email attached as Exhibit G, refers to a "Production Readiness Review." A PRR is a formal meeting that must take place prior to the implementation of a change request that results in a major system enhancement.

29. The Department has also had communications with borrowers related to the Student Debt Relief rulemaking. Exhibit C contains an opt-out email sent to borrowers to inform them of the Department's plans to finalize regulations in the Student Debt Relief rulemaking, and to enable them to opt out of that anticipated benefit if they chose. The contents of this email were also publicly shared on FSA's website.[2]

---

[2] *See* https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2024-08-06/update-student-debt-relief-opt-out-communications.

8

**Current Status of CR 7037**

30. As of the date the Court entered a temporary restraining order, CR 7037 had already been modified into the contract and system development and testing was ongoing. The Department was still required, however, to complete additional stages of testing, review, and analysis before making any decision on whether or not to issue forgiveness on any borrower account and on what terms.

31. The same day the Court entered a temporary restraining order, the Department issued stop work orders to its servicers, instructing them to immediately cease all activity related to CR 7037 (and also issued stop work orders for a related CR, CR 7109, which appears in Exhibit L to the Complaint).

32. No final rules have been published in the Student Debt Relief rulemaking.

33. The Department has not discharged any loans pursuant to the authorities it proposed in its April 2024 Student Debt Relief NPRM, either before or after entry of the temporary retraining order. Nor has it instructed servicers to discharge any loans, either before or after the entry of the temporary restraining order.

34. Absent the temporary restraining order, the Department would not have issued forgiveness specified in the proposed rules without first finalizing the rules.

35. If the Department decides (and is permitted by any court order then in effect) to proceed with issuing debt forgiveness after the promulgation of a final rule, it would first need to instruct the servicer to provide forgiveness by providing to the servicer a "production file," which includes relevant loan information and specific instructions to the servicer to implement the change.

9

36. A production file with corresponding instructions to take action after a contract modification is finalized is distinct from a test file, which is used to ensure system interoperability during development.

37. Even if the rules were finalized, the Department would not implement proposed 34 C.F.R. § 30.84, which proposes to authorize relief for borrowers who are eligible for forgiveness under an income-driven repayment plan but who are not enrolled in such a plan, while forgiveness under any such plan itself is enjoined (as is the case under the Eighth Circuit's injunction in *Missouri v. Biden*, Nos. 24-2332 and 24-2351).

10

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of September 2024.

James Richard Kvaal

11