**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

STATE OF MISSOURI,
STATE OF GEORGIA,
STATE OF ALABAMA
STATE OF ARKANSAS,
STATE OF FLORIDA,
STATE OF NORTH DAKOTA, and
STATE OF OHIO

      *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION,

MIGUEL A. CARDONA, in his official
capacity as Secretary, United States
Department of Education, and

JOSEPH R. BIDEN, Jr., in his official
capacity as President of the United States,

      *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:24-cv-00103

<u>**PLAINTIFF STATES' REPLY MEMORANDUM IN SUPPORT OF THE MOTION FOR
A STAY/ PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER AND
RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND CLARIFY**</u>

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................... 1

SUMMARY OF THE ARGUMENT ....................................................................................... 3

ARGUMENT .......................................................................................................................... 6

    I.   The Court Has Jurisdiction................................................................................... 6

        A.   The Third Mass Cancellation Rule is "final" for purposes of the APA. ......................... 6

        B.   The finality argument also fails because finality is not required when temporary relief is needed to prevent evasion of judicial review. ................................... 10

        C.   The States have established standing to bring their claims. ........................................... 12

        D.   This Court need not even consider Georgia's standing, and venue is proper in any event.......................................................................................................................... 19

    II.   The States Are Likely to Succeed on the Merits................................................ 23

    III.   The Remaining Factors Favor the States. ........................................................ 25

        A.   The States face irreparable harm................................................................................. 25

        B.   The balance of harms and public interest favor the States. ............................................ 27

    IV.   The Requested Relief Is Appropriately Tailored. .......................................... 28

        A.   An order against the entire rule is necessary to ensure complete relief. ....................... 29

        B.   The President is a proper defendant. ......................................................................... 32

    V.   Response to Motion to Clarify ......................................................................... 34

CONCLUSION ..................................................................................................................... 34

CERTIFICATE OF SERVICE .............................................................................................. 36

# INTRODUCTION

Almost none of the facts are in dispute.  Defendants do not dispute that even as they were advertising to the public that the Department would "publish its final rule on student loan relief sometime in October,"[1] they secretly were stressing to federal contractors "the Department's intention to promulgate a final rule in early *September*" instead, Dfts' Br. (ECF 35) at 17 (emphasis added).[2]  They do not dispute they instructed loan servicers to, before September 5, "report the balances" of loans to be forgiven, to "immediately" process forgiveness as soon as Defendants instructed, and to be "performance-ready by no later than September 9" in anticipation of the "Debt Relief Surge Support beginning September 9."  Ex. D at 3–4; Ex. L at 2–3, 6.  They do not dispute that these instructions used mandatory language like "shall" and "required."  *E.g.*, Ex. D (64 uses of "shall").  And they do not dispute they can force loan servicers to cancel loans within hours after publishing the rule.  Indeed they concede that the *only* thing they need to do to implement forgiveness after publication is "provid[e] to the servicer a 'production file.'"  ECF 35-1 ¶ 35.

Perhaps the biggest takeaway is Defendants' persistent refusal to commit to the 60-day waiting period before implementation.  It should be easy for Defendants to tell this Court that they will wait to implement the rule until at least 60 days after it is published.  That is what the law requires.  5 U.S.C. § 801(a)(3).  But Defendants refuse to make that commitment to this Court, like they refused to make that commitment late last month to Congress.  This betrays Defendants'

---

[1] Annie Nova, *Biden May Start Forgiving Student Debt in October*, CNBC (Sept. 3, 2024), https://www.cnbc.com/2024/09/03/biden-may-start-forgiving-student-debt-next-month-.html.
This spring, Defendants stated on the website of the Office of Information and Regulatory Affairs their intent to publish in October.  Office of Information and Regulatory Affairs, RIN: 1840-AD93, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=1840-AD93.

[2] *See also* Ex. L at 2 ("In September of 2024, the Biden-Harris Administration will launch the Federal Student Loan Debt Initiative.").
All page numbers reference the ECF number in the docket header.

true intentions:  For months, they planned to publish the rule at the beginning of September and then immediately process forgiveness of $73 billion before anybody could sue.

That explains why Defendants rely almost exclusively on their (flawed) argument that the States cannot sue until the rule is published.  As soon as publication occurs, they know they will be able to forgive at least $73 billion[3] before anybody can sue and they will be able to force loan servicers to send millions of emails crediting the "Biden-Harris Administration" for that cancellation just weeks before the election.  Ex. J at 1.  Defendants' entire course of conduct—telling the public and the loan servicers two different timelines for publication, instructing the loan servicers to be ready for a debt relief "surge" in early September, waiting to publish the rule until right before the "surge"—has all been calculated to cancel as many loans as possible while evading judicial review.  Defendants *need* to avoid judicial review because their first two mass cancellation plans were struck down, and third is the weakest yet.  Here, "a page of history is worth a volume of logic."  *Jones v. Hendrix*, 599 U.S. 465, 472 (2023).

Defendants' brief rests almost entirely on their finality argument, but that argument suffers from at least two immediately apparent flaws.  First, the rule is final, just like the First Mass Cancellation rule was final before publication.  Defendants suggest the specific date that forgiveness will occur is variable, but the documents unequivocally show that the decision *to* forgive was made long ago.  In fact, they *admit* that until the Court issued the TRO, they had planned to do so "in early September."  ECF 35 at 17.  (They appear to have delayed so they can make this finality argument.).  And Kvaal's declaration concedes that Defendants have already

_____

[3] The $73 billion figure reflects the Departments' estimated cost.  This estimate systematically excluded known costs and is based on the faulty assumption that the Second Mass Cancellation Plan would proceed.  ECF 1 ¶ 71–75; ECF 5 at 13–14, 44–45.  For this reason, Plaintiff States expect the costs of immediate implementation would far surpass $73 billion.

altered MOHELA's contract, changing MOHELA's "contractual performance obligations."  ECF 35-1 ¶¶ 6, 30.

Second, the finality argument misses the point.  The rule need not even be final because this Court has authority under the All Writs Act (or what the Supreme Court has called "incidental" jurisdiction) to prevent Defendants from structuring their mass cancellation efforts to evade judicial review.  "A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established.  When potential jurisdiction exists, a federal court may issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it." *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 n.19 (5th Cir. 1978).

Apart from the finality argument, Defendants offer virtually nothing.  On standing, Defendants simply ignore many of the States' arguments (as well as binding Supreme Court precedent from last year).  On the merits, Defendants offer literally *one page* of analysis, and make no attempt to defend against the statutory and arbitrary-and-capricious arguments.  Those issues are thus conceded.  And on venue and scope of the injunction, Defendants' arguments have been repeatedly rejected by courts across the country.  Their venue argument has been unanimously rejected for at least 130 years.  And their scope-of-injunction argument has been twice rejected by the Supreme Court and Eighth Circuit—as recently as last month.

## SUMMARY OF THE ARGUMENT

**I.** This Court has jurisdiction**.**  The Third Mass Cancellation Rule is "final."  Even if *timing* to implement forgiveness is variable (the documents show it is not), the decision *to* forgiven was made long ago.  The Department has consummated its decision making process with respect to the purported legal authority to forgive loans and the borrower groupings for whom the new

forgiveness applies.  The Department has also altered MOHELA's contract.  Those decisions have determined "rights or obligations" from which "legal consequences will flow."  If it looks like a duck, walks like a duck, and quacks like a duck, then it's a duck.  The only thing preventing implementation of forgiveness is this lawsuit.  At the very least, the finality argument misses the point because this Court has authority under the All Writs Act and "incidental" jurisdiction to prevent Defendants from evading judicial review.

On standing, Defendants do not dispute Missouri has standing if the forgiveness decision is final because MOHELA will lose servicing fees.  Defendants do dispute the other theories of standing, but Defendants are wrong to do so.  First, the documents unequivocally establish that the rule forces MOHELA to bear administrative costs and causes MOHELA to lose future interest revenue.  Second, courts have applied the competitor-standing doctrine when the government is the competitor, and it is not "speculative" that borrowers will choose the Federal Government over the Bank of North Dakota under the rule.  Any self-interested borrower would choose cancellation over the Bank's requirement of actual repayment.  Third, binding Supreme Court precedent permits the States to rely on a theory of loss of tax revenue.  The idea that States might mitigate this harm by changing their laws simply substitutes a fiscal injury for a sovereign one.

Venue is proper.  Before the Fifth Circuit split, that court expressly rejected Defendants' venue argument.  Indeed, for over 130 years, *every* court to assess the issue has rejected Defendants' argument.  Georgia "resides" in the Southern District of Georgia, just as it does in every federal district of the State.

**II.** Plaintiff States are likely to succeed on the merits.  Defendants devote just *one* page to this issue.  And their only argument is the (flawed) argument that the Third Mass Cancellation Rule is not final.  They make *no* attempt to satisfy the major questions doctrine, rebut the States'

4

statutory arguments, or respond to the arbitrary-and-capriciousness arguments. Because Defendants chose not to contest these issues, this Court should deem them conceded.

It is not surprising that Defendants make no attempt to contest the merits because the Third Mass Cancellation Rule is brazenly unlawful. Both of the first two mass cancellation rules were struck down under the major questions doctrine. And this third attempt rests on Defendants' weakest statutory argument yet.

**III**. The remaining factors favor the States. Plaintiffs have easily shown irreparable harm. It makes little difference that the rule has not been published. Though Defendants dispute that the rule is already final, they concede it will be final upon publication and that before the TRO they had intended to publish the rule in "early September." They further admit that they will be able to immediately cancel loans immediately after publication. The States thus face an imminent trigger: absent relief, Defendants will be able to mass cancel hundreds of billions of dollars nearly instantaneously—all while evading judicial review.

The public interest favors the States. "[T]he public has no interest in enforcing what is likely unconstitutional regulations." *Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty., Georgia*, 540 F. Supp. 3d 1291, 1319 (S.D. Ga. 2021). Defendants' only purported harm is "interference" in an "ongoing administrative process." But the TRO does not restrain Defendants from publishing the rule, only *implementing* it. If anything, it is Defendants who are harming the public through empty promises about their legal authority to mass forgive loans. This has resulted in nearly 1/3 of American borrowers reporting that they have paused paying their loans in hopes of receiving forgiveness. Defendants' deception hurts both borrowers and the public fisc.

**IV.** The requested relief appropriately tailored. Plaintiff States are entitled to the same relief obtained in each of the first two mass cancellation challenges: an order prohibiting

implementation of the entire rule.  Defendants ask this Court to ignore plainly established Supreme Court precedent from *Biden v. Nebraska*.  It should not do so.  Defendants' arguments were rejected by the Supreme Court just last month.  The same result is appropriate here.

The President is also an appropriate defendant in this case.  Defendants repeat nearly verbatim the same argument for dismissing the President that they advanced in front of the Eastern District of Missouri.  That court properly rejected their argument, and this Court should too.  The Supreme Court has held that declaratory relief is available against the President.  And while injunctive relief against the President is rarer, it is permitted where full relief is not obtained against subordinate officials.  The President has openly bragged that *Biden v. Nebraska* did not stop him and has now tried twice to circumvent that ruling.  Injunctive relief against the President may prove necessary if the President ignores an injunction against the Secretary.  At the very least, Plaintiffs have alleged sufficient facts to avoid a motion to dismiss on this issue.

**V.** On the motion to clarify, the States do not oppose Defendants publishing the Third Mass Cancellation Rule, and do not believe the TRO prohibits the same.  But the States do object to any "clarification" that would permit Defendants to continue preparatory work enabling them to "trigger" loan cancellation "imminently" upon publication.

## ARGUMENT

### I.      The Court Has Jurisdiction.

#### A.  The Third Mass Cancellation Rule is "final" for purposes of the APA.

Defendants' finality argument rests on a straw man.  Contrary to Defendants' assertions, the States do not contend that the notice of proposed rulemaking by itself is final agency action.  ECF 35 at 20–21.  Rather, the States have produced undisputed evidence showing that in the months after the rule was proposed, Defendants finished determining rights and obligations in two ways: they made a final decision to cancel student loans, and they altered MOHELA's contract.

**1.** First, they created a forgiveness program and determined what categories of borrowers will receive forgiveness. The documents reveal a *definite* plan to cancel loans ("In September of 2024, the Biden-Harris Administration *will* launch the Federal Student Loan Debt Initiative," Ex. L at 2 (emphasis added))[4] complete with highly specific dates for that cancellation (*e.g.*, be "performance-ready by no later than September 9" in anticipation of the "Debt Relief Surge Support beginning September 9," Ex. D at 3–4; Ex. L at 2–3, 6) and complete with instructions that loan servicers "immediately" process forgiveness upon receipt of "forgiveness files" in early September, Ex. D at 4. While Defendants assert the specific timing to *implement* the forgiveness decision was variable, the decision *to forgive* has already been made. That determined "rights or obligations." *Tennessee Valley Auth. v. Whitman*, 336 F.3d 1236, 1248 (11th Cir. 2003).

That Defendants long ago made a final decision to forgive loans is not surprising in light of the unique rulemaking the Department undertook, which greatly limited its ability to deviate from the text it proposed in April. Under the Higher Education Act, the Department had to go through "negotiated rulemaking" rather than ordinary notice and comment. Through that process, the Department hand-selected a committee whose job it was to draft language by unanimous consensus. That happened here, so the Department could "not substantively alter the consensus-based language of its proposed regulations unless the Department reopen[ed] the negotiated rulemaking process or provide[d] a written explanation to the negotiators regarding why it has decided to depart from that language." *2023 Negotiated Rulemaking Organizational Protocols*,

---

[4] *See also* Ex. D at 5 ("The new Forgiveness Measures Indicators *will be*: 1. M1 for the forgiveness Measure 1: Current Balance Exceeds Original Principal Balance - $20,000. 2. M2 for the forgiveness Measure 1: Current Balance Exceeds Original Principal Balance – Unlimited. 3. M3 as the forgiveness Measure 2: Forgiveness after 20 Years. M5 as the forgiveness Measure 2: Forgiveness after 25 Years. 5. M3 as the forgiveness Measure 3: Eligible for SAVE Forgiveness, Not Applied." (emphasis added)).

Department of Education.[5]  The Department undertook neither of those actions, so it was stuck with the exact text as proposed in April.

Defendant's sole argument against finality (at 21) is to assert that the rule is not final until it has "been published."  But they cite no case requiring publication for finality, and they ignore that when the States sued to challenge the First Mass Debt Cancellation Rule, Defendants did not dispute that the rule was final even though it was not published.  Defendants try to distinguish that case by suggesting that at that time "the Administration had announce a final intention to forgive certain student loans."  ECF 35 at 23.  It is no different here.  Through word and deed, Defendants have announced their final intention to mass cancel loans.  They sent a communication to MOHELA in July that left no doubts: "In September of 2024, the Biden-Harris Administration *will* launch the Federal Student Loan Debt Initiative."  Ex. L at 2 (emphasis added).  Their further communications instructing loan servicers to report balances between September 2 and 5 reinforce this conclusion—especially because as of September 3 (when the lawsuit was filed), Defendants had *not* changed this deadline and were still demanding loan servicers prepare for the "surge" that would begin "September 9."  Ex. L at 6.  Kvaal confirms this, acknowledging that Defendants "intended to require the servicers to be prepared to issue loan forgiveness" and to be prepared to do so by around "September 1."  ECF 35-1 ¶¶ 17, 19.

**2.** Defendants also changed "rights and obligations" for MOHELA by altering MOHELA's contract.  *Tennessee Valley Auth*, 336 F.3d at 1248.  While Defendants (at 21) accuse the States of "misunderstanding the Change Request" process, Kvaal's declaration makes clear they do not.  Kvaal insists that the "process" to change contracts "does not itself create legal obligations," ECF

---

[5] https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/student-loan-debt-reliefom-committee-protocols-final-508-accessible.pdf

35-1 ¶ 6, but then concedes that Change Request 7037 was already "modified into the contract" for MOHELA before the TRO was entered, *id.* ¶ 30.  Kvaal also acknowledges that by altering MOHELA's contract through the "change request process," Defendants have "chang[ed]" MOHELA's "contractual performance *obligations*."  *Id.* ¶ 6 (emphasis added).  In other words, while the "process" to change contracts might not "itself create legal obligations," *id.*, completing that process by altering a contract certainly does.  Defendants have thus made decisions "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Tennessee Valley Auth*, 336 F.3d at 1248.

**3.** Struggling against both realities, Defendants suggest (at 22) that the rule is not final because the Department has not "instruct[ed] the servicers to take action."  But Defendants confuse *making* a final decision with *implementing* that decision.  Defendants do not dispute, for example, that if they had already published the rule it would be final.  That remains true even though they would still need to "provid[e] to the servicer a 'production file'" listing the accounts to be cancelled.  ECF 35-1 ¶ 35.  Similarly, promulgating a rule is final agency action even if the rule must be enforced through a proceeding in court.  To hold otherwise would mean nobody could ever bring a pre-enforcement challenge to a rule.  For this reason, Kvaal's declaration is entirely beside the point.  Kvaal notes that the Department and the loan servicers have to go through testing logistics to implement forgiveness, but that does not change the fact that the Department has already made a final decision *to* forgive and was going to forgive "in early September," ECF 35 at 17, until its plans for surreptitious forgiveness were disrupted by this lawsuit.

If anything, Kvaal's discussion of forgiveness logistics highlights the need for immediate relief.  Defendants admit they can readily implement forgiveness simply by publishing the rule and then "providing to the servicer a 'production file.'" ECF 35-1 ¶ 35.  Through changes imposed

by the Department, loan servicers are now required to execute the Third Mass Cancellation Rule provisions at a moments' notice. And Defendants' have already determined when that moment is. As Kvaal admits, implementation dates are changed "*prior* to contract modification." *Id.* ¶ 18 (emphasis added). Here, the contract modification already occurred. Defendants have locked in dates for implementation for "early September 2024." ECF 35 at 17. They simply changed those dates when the States found out, sued, and obtained emergency relief.

**4.** Finally, Defendants try (at 11) to fault the States for not "contact[ing] the Department to ask about the change request documents." But the States uncovered documents at the end of August showing that Defendants had been misleading the public for months, telling the public the rule would be published in October when in fact they now admit they had always intended to publish "in early September." ECF 35 at 17. Contacting the Department would have served no purpose, and likely would have induced them to implement the Third Mass Cancellation Rule even quicker. Moreover, when *Congress* reached out to the Department in August, asking for the Department to commit to follow statutes requiring delayed implementation after publication, the Department refused to agree to that commitment. ECF 1 ¶¶ 93–94. Defendants have been working in the shadows for months. Plaintiff States' only option was to shine a light.

> **B. The finality argument also fails because finality is not required when temporary relief is needed to prevent evasion of judicial review.**

In arguing about finality, Defendants miss the point: Where an agency could evade judicial review, ordinary finality does not apply. Instead, courts have authority under the All Writs Act and what the Supreme Court has called "incidental equitable jurisdiction" to prevent Defendants from structuring their mass cancellation efforts to evade judicial review. That Act gives federal courts authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The Fifth Circuit (in a

holding predating creation of the Eleventh Circuit), expressly held that this statute enables courts to issue temporary restraining orders in exactly these circumstances: "A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established.  When potential jurisdiction exists, a federal court may issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it."  *ITT Community Development Corp.*, 569 F.2d at 1359 n.19.  For example, the Supreme Court has held that a court can use the All Writs Act to block a merger between companies when "an effective remedial order, once the merger was implemented, would otherwise be virtually impossible."  *F.T.C. v. Dean Foods Co*., 384 U.S. 597, 604 (1966).

Citing All Writs Act cases, the Supreme Court has further recognized an inherent "judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels."  *Arrow Transportation Co. v. Southern Railway Co*., 372 U.S. 658, 671 n.22 (1963).  This power is "incidental to the courts' jurisdiction to review final agency action."  *Id.*  A "court's incidental equitable jurisdiction," the D.C. Circuit has said, "gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review."  *Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987).

This case is exactly why that Act and doctrine exist.  Defendants concede that the *only* thing they need to do to implement forgiveness is publish the rule and then "provid[e] to the servicer a 'production file.'"  ECF 35-1 ¶ 35.  Through these simple, ministerial actions, Defendants can forgive $73 billion almost instantaneously.  And once accounts are closed, "States cannot turn back the clock on any loans that have already been forgiven."  TRO Order, ECF 17 at 4 (quoting *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024)).  Thus, even if Defendants were

correct that the States sued "before the court's jurisdiction has been established," this Court may still "issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it." *ITT Community Development Corp.*, 569 F.2d at 1359 n.19. Absent relief, Defendants could evade judicial review, so action under the All Writs Act is warranted.

### C. The States have established standing to bring their claims.

The States easily have standing under several different theories.

**1.** The first is easiest because Defendants never even dispute that MOHELA will be harmed through loss of servicing revenue from implementation of the Third Mass Cancellation Rule. They simply say there is no final agency action yet, so there is no standing. ECF 35 at 23–24. So once the Court finds that the rule is final, as shown above, it should have no difficulty finding that Missouri has standing to sue. Indeed, the Court is bound by the Supreme Court's ruling that where "[t]he Secretary's plan will cut MOHELA's revenues," "Missouri thus has suffered an injury in fact sufficient to give it standing to challenge the Secretary's plan." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366, 2368 (2023). That is the end of that question.

Defendants' attempts to challenge Missouri's additional theories of standing fare no better. First, MOHELA has suffered and will continue to suffer administrative costs associated with the Third Mass Cancellation Rule. Defendants try to evade this by noting that *some* administrative costs are covered by the Department, but they ignore that MOHELA is *required* to bear other administrative costs. *See* ECF 1-12 at 6 ("reimbursement is limited to new hire training and upskilling of existing agent but *does not include* compensation for training BPO trainers, managers, QA teams, licenses or equipment" (emphasis added)); ECF 1-4 ("shall be implemented with this change request at no additional cost"); ECF 1-7 ("You may have to prioritize testing SDR functions within your release to meet this deadline."). This harms MOHELA and thus Missouri.

Second, Defendants argue (at 24–25) that it is speculative that borrowers will consolidate FFEL private loans into Direct Loans because of the Third Mass Cancellation Rule.  To the contrary, Defendants do not deny that they themselves expressly urge borrowers to do so.  *See* ECF 1 ¶ 112.  And Defendants even admit (at 26–27) it is a "fact" that MOHELA consolidations "spiked" when forgiveness was announced under both of the prior mass forgiveness rules—and that consolidations dropped off after the first Eighth Circuit injunction.  They try to massage this reality by claiming that it is "at most correlation."  But the correlation between massive spikes both times mass cancellation rules were announced would be an awfully strange coincidence.

Further Defendants misconstrue (at 25–26) the States' arguments with respect to consolidations.  Consolidations under the Third Mass Cancellation Rule are likely not only because of the rule's attempt to give borrowers the benefit of forgiveness under the SAVE Plan (a part of the rule Defendants concede is unlawful), but also because of the provision in the rule forgiving all accounts after between 20 and 25 years.  Almost identical provisions were a key element within the Second Mass Cancellation Rule.  The Third Mass Cancellation Rule provides a new route to the exact benefit that is otherwise enjoined by the Eighth Circuit.  Yet Defendants do not offer any suggestion that this provision would be held in abeyance while the Eighth Circuit proceeds.

Moreover, this provision is even *more* certain to induce consolidations.  Traditionally, when a borrower consolidated a FFEL private loan into a federal direct loan, consolidation required a "[l]onger repayment period"; the timeline for forgiveness restarted.[6]  Not so under the Third Mass Cancellation Rule.  Because the 20/25-year forgiveness provision is calculated by when the *original* loan entered repayment, not when a loan was consolidated, the new Rule removes any downside to consolidation.  To put a finer point on it, if a borrower has an FFEL private loan for

---

[6] https://studentaid.gov/articles/5-things-before-consolidating-student-loans/

undergraduate study, and has been in repayment for 20 years, consolidation will result in immediate forgiveness, with no additional requirements. It does not take a Ph.D. to recognize that every borrower would prefer immediate forgiveness to 5 or 10 more years of payments. Borrowers will predictably consolidate because of this rule. *California v. Texas*, 593 U.S. 659, 675 (2021).

Third, Defendants suggest (at 27) that MOHELA will not be harmed *at all* if the FFEL private loans it holds are consolidated. But in the very next line, Defendants admit that, following consolidation, MOHELA will lose "predicted interest income." That predicted income accounts for $51 million in revenue for MOHELA each year. ECF 1 ¶ 104 (citing source).

**2.** Similarly meritless are Defendants' attempts to dispute that the Bank of North Dakota is harmed by the Third Mass Cancellation Rule.

First, Defendants dispute that North Dakota can raise the competitor-standing doctrine in a suit against the Federal Government. They contend the doctrine applies "*only* in the context of competition between two non-governmental actors." ECF 35 at 29 (emphasis added). Courts have expressly rejected that argument. The D.C. Circuit, for example, held that a company "clearly had standing" to enjoin the U.S. Department of Agriculture "from operating a government news wire service in competition with the appellants." *P.A.M. News Corp. v. Hardin*, 440 F.2d 255, 256–57 (D.C. Cir. 1971). Defendants fail to cite a single case holding to the contrary, and courts routinely describe the doctrine of competitor standing in generally applicable terms. *See, e.g.*, *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) ("Regardless how we have phrased the standard in any particular case, . . . the basic requirement common to all our cases is that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact."); *see also, e.g.*, *id.* at 72 ("we have applied the doctrine of competitor

standing to the political 'market,' holding incumbent congressmen had standing to challenge new campaign finance regulations that made it easier for rival candidates to compete against them").

That makes sense because governments operate in more than one capacity.  Governments regularly engage in proprietary activities—that is, business activities—and both North Dakota and the Federal Government do so here.  Government "is bound to have a variety of proprietary interests." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982). "As a proprietor, it is likely to have the same interests as other similarly situated proprietors.  And like other such proprietors it may at times need to pursue those interests in court."  *Id.*  When governments act as proprietors, they are treated that way.  It follows that the competitor-standing doctrine applies to governmental organizations when they operate as proprietors.

Second, Defendants speculate that some borrowers may still choose to borrow from North Dakota (and thus pay back in full) rather than the Federal Government (and have guaranteed forgiveness).  Even if true, a "predictable effect," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), of the Third Mass Cancellation Rule is that at least *some* borrowers will choose the Federal Government over the Bank because of the Third Mass Cancellation Rule  The Bank need only establish it is "likely" there is a "substantial risk" of losing even one customer.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  It has easily done so.

**3.** Defendants are also wrong on the tax-revenue theory of standing.  As Defendants do not dispute, loan forgiveness that occurs in 2026 or later will be taxed in several of the States, but loan forgiveness before that will not be taxed because Congress changed federal law to exempt loan forgiveness from taxation in 2024 and 2025, and state law is tied to federal law.  While general harm to the economy "caus[ing] a decline in general tax revenues" does not confer standing, "loss

of specific tax revenues" does. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Defendants make three attempts to evade the plain holding of *Wyoming*. None succeeds.

First, Defendants try (at 33) to inject a never-before-seen "discrimination" element in the standing analysis to distinguish *Wyoming* from this case. But even a cursory review of *Wyoming* shows that the purported discrimination there played no role in the Supreme Court's standing considerations, but was instead a merits question. *Wyoming*, 502 U.S. at 446–454. Plaintiffs need not "claim that the Department targeted or discriminated against them." ECF 35 at 33. It is enough to show, as in *Wyoming*, the "loss of specific tax revenues."

Second, Defendants are wrong to assert (at 31) that the States' harms are somehow self-inflicted. The States tied their taxation to federal law years before federal law changed or Defendants announced this rule. To eliminate this injury, the States would have to change their laws, but forcing a State to choose between economic harm and changing its laws creates a sovereign injury. The States have "sovereign interests" in "the power to create and enforce a legal code." *Snapp*, 458 U.S. at 601. They also have a sovereign interest in not changing their laws because "a State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986); *accord Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) ("[B]eing pressured to change state law constitutes an injury."). Moreover, changing their laws would create administrative burdens and decrease tax revenues. It would also force the States to give up other priorities in light of the limited legislative time.

Defendants rely on *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), but that case is consistent with this principal. There, the Supreme Court declined to exercise "original jurisdiction" when Pennsylvania—citing a state law giving Pennsylvanians "credit for taxes paid to New Jersey"—challenged a New Jersey tax law. *Id.* at 664. The Court determined that

Pennsylvania's injury was "self-inflicted." *Id.*  Several courts, including the Eleventh Circuit, have determined that this case only "concerned the Supreme Court's original jurisdiction as opposed to Article III standing."  *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021); *accord Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1130 (11th Cir. 2005) (considering *Pennsylvania* under jurisdiction to hear case, not standing).  Article III and original jurisdiction are different.  Original jurisdiction is statutory, and the Supreme Court has interpreted that statute "as providing [the Supreme Court] with substantial discretion to make case-by-case judgments as to the practical necessity" of permitting a case to proceed.  *Texas v. New Mexico*, 462 U.S. 554, 570 (1983).

Courts also have noted that Wyoming, but not Pennsylvania, "sued in response to major changes in the defendant states' policies." *Texas v. United States*, 809 F.3d at 158.  "Conversely, the *Pennsylvania v. New Jersey* plaintiffs sued not because of a change in the defendant states' laws but because they believed that *Austin v. New Hampshire*, 420 U.S. 656 (1975), had rendered the defendants' laws unconstitutional." *Id.*

This case is much more like *Wyoming*.  The States do not seek to leverage new Supreme Court doctrine to attack a longstanding law or regulation.  The States instead sue in response to a change in policy.  *Cf. Alabama v. U.S. Army Corps of Engineers*, 424 F.3d at 1130 ("the States here do not seek relief from each other or from harm caused by another State; rather, each has a different view of how the [Federal Defendant] should fulfill its obligations under [ ] federal law."). "The fact that [the States] sued in response to a significant change in the defendants' policies shows that its injury is not self-inflicted." *Texas v. United States*, 809 F.3d at 158.  And in contrast to *Clapper v. Amnesty Int'l USA*, where plaintiffs tried to "manufacture standing by choosing to make expenditures," 568 U.S. 398, 402 (2013), "there is no allegation that [the States here] passed [their taxation] law[s] to manufacture standing," *Texas v. United States*, 809 F.3d at 159.

Defendants' argument would make nonsense out of an untold number of cases.  All the time, courts hear cases where States or local governments facing economic injury could mitigate that injury by changing their laws.  For example, the Supreme Court permitted South Dakota to challenge a law conditioning highway funding on adopting a minimum drinking age.  *South Dakota v. Dole*, 483 U.S. 203 (1987).  South Dakota could have resolved its injury by changing its law, but the Supreme Court never suggested the State's injury was self-inflicted.  Similarly, the Supreme Court held that a "reduction in property values directly injures a municipality by diminishing its tax base" even though a municipality could solve that injury by abolishing its property tax.  *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979).  Lower courts routinely adopt similar analysis.  *E.g.*, *New Jersey v. EPA*, 989 F.3d at 1046 ("[I]ntervenors' argument is contrary to this court's precedent, which has not treated a state's ability to change its laws to evade injury as precluding standing to challenge EPA's actions under the Act.  EPA's actions injure states when those actions necessitate changes to state laws . . . ."); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021) (injury where State challenged reduction in federal credit for paying state taxes because reduced federal credit "makes homeownership more expensive, the cap reduces demand in the housing market, causing lower prices and fewer sales, and leads to specific losses in tax revenue derived from property and real estate transfer taxes"); *Sierra Club v. Trump*, 977 F.3d 853, 868 (9th Cir. 2020), *cert. granted, judgment vacated as moot*, 142 S. Ct. 56 (2021) (injury where federal action interfered with "California's ability to enforce its state laws" even though California could eliminate injury by changing those laws); *id.* at 871 (injury because federal border wall construction would lead to "loss of tax revenues," even though States could change those tax laws).

Third, Defendants next rely on a century-old case to argue that the States are "required to show a 'direct injury'" to tax revenue.  ECF 35 at 32 (citing *Florida v. Mellon*, 273 U.S. 12 (1927)).  But as Defendants well know, if a "direct injury" was required a hundred years ago, it no longer is.  More recent doctrine expressly holds that parties may rely on theories of *indirect* injury.  *E.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).  As established above, courts regularly permit parties to sue based on indirect loss of tax revenue.

Indeed, the injury here has a much tighter nexus than the indirect injury in *Department of Commerce*.  There, the Supreme Court unanimously determined that States could sue under the theory that a citizenship question on the Census would have the "predictable" effect of encouraging private parties to "unlawfully" decline to fill out the Census, causing an undercount in various States and thus a loss in revenue.  139 S. Ct. at 2566.  Here, the private actors would not even need to do anything unlawful—or anything at all.  They are automatically opted-in to the Third Mass Cancellation Rule's provisions, which necessarily will cause the States loss of tax revenue.

Defendants again raise (at 32–33) a baseless "speculation" argument, stating that the timing of loan cancellation is affected by many variables, and so it cannot be known for sure whether the Final Rule will cause forgiveness before 2026.  To the contrary, the rule would immediately cancel at least $73 billion in loans.  None of that amount can be taxed if cancellation occurs before 2026.  At the very least, Plaintiffs have established a "substantial risk" of losing tax revenue.

### D.  This Court need not even consider Georgia's standing, and venue is proper in any event.

Unable to assail Missouri's standing, which has repeatedly been upheld in the Eighth Circuit and the Supreme Court, Defendants hyperfocus on Georgia's standing and assert a venue argument that literally every court to have considered the issue has rejected—including the Fifth Circuit before the Eleventh Circuit was created.  These arguments fail.

19

**1.** At the outset, Georgia does have standing for the reasons stated above.  But because Missouri's standing is so clear, this Court need not consider Georgia separately.  As this Court has already held, "So long as one of the Plaintiffs has standing, the Court need not decide whether each Plaintiff has standing, especially where they seek a particular form of global relief." *Altamaha Riverkeeper v. United States Army Corps of Engineers*, No. CV 418-251, 2020 WL 5837650, at *5 (S.D. Ga., Sept. 30, 2020) (Hall, J.).  Indeed, given the well-established rule that only "one plaintiff" must establish standing, *Biden v. Nebraska*, 143 S. Ct. at 2365, it would arguably be an advisory opinion to assess Georgia's standing.

**2.** Even stranger is Defendants' strange venue argument that Georgia somehow does not reside everywhere within its borders—that a State can access federal courts only in the district in which its state capital is located.  In a massive understatement, Defendants say their position has been rejected by "several" courts.  ECF 37 at 16.  In fact, Defendants' position has been *unanimously* rejected for more than 130 years, including by the Fifth Circuit when its jurisdiction still covered Georgia.  "[E]very court that has considered a state's residency, including the Fifth Circuit [more than 130 years ago], has rejected the argument that a state resides only in its capital city." *Texas v. DHS*, 661 F. Supp. 3d 683, 689 (S.D. Tex. 2023) (citing cases); *see also Utah v. Walsh*, No. 2:23-cv-016, 2023 WL 2663256, at *3 (N.D. Tex. 2023) (citing cases); *Atlanta & F. R. Co. v. Western Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) ("the state government … resides at every point within the boundaries of the state").  For purposes of venue, the settled and unanimous rule is that "[a] state is held to reside in any district within it."  Wright & Miller, 14D *Federal Practice & Procedure* § 3815 (4th ed. 2023).  Because the Fifth Circuit issued its decision before creation of the Eleventh Circuit, *Atlanta & F.R. Co.* is binding on this Court.  That means Georgia can sue in any of the three federal judicial districts.

Against this unanimous, settled, binding rule, Defendants cite nothing on point.  They do not even inform this Court of binding Fifth Circuit precedent rejecting their theory.  And they cannot even identify one case adopting their theory.  (There is none.)  Instead, they cite cases stating, for example, that a *government official* resides in one district.  *See* ECF 37 at 16.  While that rule might make sense given that a public official can physically be only in one district at a time, the plaintiffs here are sovereign states, not individual officials, and "[a] state is ubiquitous throughout its sovereign borders."  *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).  Georgia routinely sues the Federal Government in the Southern District, and has done so on a number of occasions in just the last several years.  Notably, the federal government defendants in those case did not raise this dubious argument.[7]

Defendants fare no better on the text.  They drill in on subsection (c)(2) of the venue statute, which states that venue for "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated," shall be "only in the judicial district in which it maintains its principal place of business."  28 U.S.C. § 1391(c)(2).  And they say Georgia's place of "business" is Atlanta.  But a State is not "an entity" that conducts "business" in the sense discussed by that statute, which "explicitly refers to the incorporation status of the 'entity,' indicating that the term refers to some organization, not a state."  *California v. Azar*, 911 F.3d at 570.  The statute reinforces that interpretation in the next subsection by distinguishing States from entities.  *Id.* (citing 28 U.S.C. § 1391(d)).  Simply put, the statute "makes no reference one way or the other as to the residency of a sovereign state."  *Texas v. DHS*, 661 F. Supp. 3d at 689.  It

---

[7] *See, e.g.*, Defendants' Motion to Dismiss, *Georgia v. Brooks-Lasure*, No. 22-cv-00006, ECF 23 (S.D. Ga. May 5, 2022), https://www.courtlistener.com/docket/62621252/23/the-state-of-georgia-v-chiquita-brooks-lasure; *Kansas v. U.S. Dep't of Labor*, No. 24-cv-00076; *Georgia v. Brooks-Lasure*, No. 24-cv-00016.

"governs the residency of corporations and other business organizations, not sovereign states." *Florida v. United States*, No. 3:21CV1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022).

Defendants' argument here is so far afield that one wonders why they even raise it. Defendants should know better. They mostly copy-pasted this exact argument from their motion to dismiss in *Missouri v. Biden*, where it was summarily dispensed. No. 24-cv-00520, 2024 WL 3104514, at *20 (June 24, 2024) ("Defendants' argument has been rejected by every court where it has been raised.").

**3.** Even if there were a venue problem, that would not necessitate dismissal or transfer. In a student-loan lawsuit brought by Kansas in the District of Kansas against the Second Mass Cancellation Rule, the district court dismissed Kansas for lack of standing but—concluding that other States had standing—retained jurisdiction to rule against the Federal Government on the merits. *Kansas v. Biden*, No. 6:24-cv-01057, ECF 68 and 76 (2024). Nothing would prohibit this Court from doing the same. Defendants (ECF 37 at 15) cite Wright & Miller for the proposition that "venue cannot be based on the joinder of a plaintiff," but they omit the rest of the sentence: "venue cannot be based on the joinder of a plaintiff *with a frivolous claim* or of a plaintiff who has been *improperly and collusively joined* for the purpose of creating venue in the district." 14D Wright and Miller, Federal Practice & Procedure § 3815 (4th ed. June 2024) (footnotes omitted) (emphasis added). Defendants do not contend that any of these things occurred.

Defendants' request for dismissal is a transparent attempt to eliminate a TRO so they can quickly cancel loans faster than the States could sue again. They say the States "reasonably could have foreseen" that venue is improper. ECF 37 at 18. But there is nothing reasonably foreseeable about a district court breaking from 130 years of unanimity—especially when the Fifth Circuit has

weighed in on the venue issue already, and that Fifth Circuit decision binds this Court because it predates creation of the Eleventh Circuit.

## II.    The States Are Likely to Succeed on the Merits.

While the States dedicated 16 pages to arguing likelihood of success on the merits, Defendants devote just *one*.  And their only argument is the (flawed) argument that the Third Mass Cancellation Rule is not final.  They make *no* attempt to satisfy the major questions doctrine, rebut the States' statutory arguments, or respond to the arbitrary-and-capriciousness arguments. Because Defendants chose not to contest these issues, this Court should deem them conceded. *E.g.*, *Wannall v. Honeywell, Inc*., 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."); *Garcia v. Nebraska Student Loan Program, Inc*, No. 15-20716-CIV, 2015 WL 11237020, at *2 (S.D. Fla. Apr. 17, 2015) (similar).  Plaintiffs also concede (at 14) that implementing § 30.84 of the rule would be unlawful while the Eighth Circuit injunction remains in effect.

It is not surprising that Defendants make no attempt to contest the merits (other than by raising their flawed finality argument) because the Third Mass Cancellation Rule is brazenly unlawful.  As outlined in the States' opening brief, the Supreme Court applied the major questions doctrine to strike down the Defendants' first unlawful mass cancellation program, *Biden v. Nebraska*, 143 S. Ct. at 2375, and the Eighth Circuit applied the same just last month to enjoin Defendants' second unlawful mass cancellation program, *Missouri v. Biden*, 112 F.4th at 5357. This plan is no different.  If anything, it relies on even weaker statutory authority.

Defendants' refusal to defend on statutory grounds is even more egregious.   While Defendants' declarant asserts that "[n]o final rules have been published in the Student Debt Relief rulemaking," ECF 35-1 ¶ 32, he conspicuously does not dispute that the scope of, and purported

legal bases for, the Third Mass Cancellation Rule have been finalized.  The purported legal basis for the rule is section 432(a), the lynchpin of the Third Mass Debt Cancellation Rule's provisions. Without it, everything must fall.  Yet Defendants omit any reference to this lynchpin statute in their brief because they have no defense for why they are trying to use a statute that the President, Congress, the Speaker of the House, and the Department all disclaimed within the last three years.

Perhaps the Secretary is now pausing publication to scramble to try to find a better statute. That too would be unfruitful.  The Department must "fully explain the factual and legal basis for the rule," *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021), and the final rule must be the "logical outgrowth" of the proposed rule, *Miami-Dade Cnty. v. E.P.A.*, 529 F.3d 1049, 1058 (11th Cir. 2008).  Publishing a rule that entirely abandoned the legal basis of the proposed rule would fail this test.

One final point on likelihood of success on the merits.  Defendants' assert (at 35) that the States press an "ill-founded accusation" that the Department is using the Third Mass Cancellation Rule to evade the Eight Circuit injunction, based on the averment from declarant Kvaal that "the Department would not implement proposed 34 C.F.R. § 30.84" while that injunction was in place. There are two glaring issues with this assertion.  First, affidavits must be based on personal knowledge.  Kvaal's supposition that Defendants "would not" take an action at a future date is not within those bounds.  Second, and more worrying, Kvaal's supposition says nothing about the previous section of the rule, § 30.83, which creates universal forgiveness for *all borrowers* at 20 or 25 years.  Defendants also tried to create broad 20/25 year forgiveness in their Second Mass Cancellation Rule, which is currently enjoined.  Following the district court's preliminary injunction in that case, Defendants established an unlawful "hybrid" plan, under which they continued forgiveness for all SAVE Plan participants after 20/25 years in violation of the court's

24

order.  Defendants' flagrant affront of the preliminary injunction was only stopped when the Eighth Circuit stepped in.  Yet the 20/25 year-provision would immediately implement the enjoined Second Mass Cancellation Rule 20/25 year forgiveness provision for every eligible SAVE Plan borrower and beyond.  Even Kvaal's bare supposition does not dispute that.

### III.   The Remaining Factors Favor the States.

#### A.  The States face irreparable harm.

Defendants' half-page analysis on irreparable harm misses the point and misstates the standard.  They say (at 36) the States must demonstrate that the harms "will . . . come to pass." But to establish irreparable harm, a plaintiff need only show that "he is *likely* to suffer irreparable harm in the absence of preliminary relief."  *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1301 (11th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added).  "[T]he harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits."  *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983).

The States have established that and more.  If Defendants are permitted to implement the Third Mass Cancellation Rule before adjudication on the merits, they would wipe out hundreds of billions of dollars in loans—and countless accounts serviced by MOHELA—in a matter of hours or days.  As the internal records show, Defendants have already pressed servicers to begin loan forgiveness at a moment's notice, and *complete* the process within at most ten days.  *See e.g.* ECF 1-4, ECF 1-7.  There is no way to claw back this action, and because "no avenue exists to recoup those losses [where] the United States has not waived sovereign immunity from suits seeking these sorts of damages," the financial harm to Plaintiff States is entirely "unrecoverable."  *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Moreover, that the Rule has not been published does not eliminate imminent, irreparable harm.  In *Georgia v. Pruitt*, federal agency defendants argued that an agency action was not "actual and imminent" because its "Applicability date" was nineteen months in the future and "may never become effective" as the agencies intended to issue a superseding rule before that date.  326 F. Supp. 3d at 1367.  The court rejected these arguments, and instead found that irreparable harm would arise "rather imminently" in response to any one of several "trigger[s]."  *Id.* at 1367–68.

So too here.  Even *if* Defendants were correct that the rule is not yet applicable (they are not), they admit the rule will be final upon publication.  "This trigger will occur … rather imminently."  *Id.*  Defendants repeat here their "intention to promulgate a final rule in early September," ECF 35 at 17, and they have publicly said the new provisions "*will*" be "finalized this fall" and will immediately begin "providing student debt relief to tens of millions of borrowers."[8] In support of that effort, the Secretary emailed borrowers the categories of forgiveness, Ex. C; the Department directed loan servicers to fully prepare their systems to provide all borrower data and execute loan forgiveness "immediately," Ex. D at 3–6; and the Department even provided loan servicers with mandatory email language to send to borrowers notifying them that "[t]he Biden-Harris Administration has forgiven a portion of your federal student loan(s)," Ex. J at 1.

Defendants try to disguise the imminent implementation by suggesting that the Third Mass Cancellation Rule "is nothing more than a proposal—which might be finalized in substantially different form, or not finalized at all."  ECF 35 at 23.  This is wholly implausible.  In addition to telling the public the rule "will' be "finalized this fall," Defendants for months instructed loan servicers to be ready to forgive at the beginning of September.  Early September was first identified

---

[8] https://www.ed.gov/news/press-releases/biden-harris-administration-takes-next-step-toward-additional-debt-relief-tens-millions-student-loan-borrowers-fall

as the "anticipated implementation date," then just the "implementation date."  Ex. F at 3.  As of

the date the States sued, September 3, Defendants had not sent communications to loan servicers

telling them that forgiveness would begin later than September or in any form other than what had

been discussed for months.  The Congressional Review Act prohibits any implementation within

60 days.  If Defendants knew they would not be able to implement in early September, they would

have been able to inform the loan servicers of that in July.  Instead, they continued sending

communications in August identifying September as the date for forgiveness.  Defendants have

long instructed loan servicers that "[i]n September of 2024, the Biden-Harris Administration *will*

launch the Federal Student Loan Debt Initiative." Ex. L a 1–2 (emphasis added).

Like in *Georgia v. Pruitt*, Plaintiff States here face an imminent trigger in the Third Mass

Cancellation Rule's implementation.  Defendants intend to immediately implement the rule as

soon as it is published—in violation of the statutory waiting periods of the CRA and 20 U.S.C.

§ 1089(c)(1).  This could happen at any moment.  If that trigger is pulled, and a stay or injunction

is not in place, Plaintiff States will suffer enormous unrecoverable financial losses.

### B.  The balance of harms and public interest favor the States.

Defendants' argument on the public interest is in direct conflict with Eleventh Circuit

precedent.  "[T]he public has no interest in enforcing what is likely unconstitutional regulations."

*Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty., Georgia*, 540 F. Supp. 3d 1291, 1319 (S.D.

Ga. 2021) (citing *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th

Cir. 2013)); *see also Lane v. United States*, No. CV 617-082, 2018 WL 11441015, at *2 (S.D. Ga.

Feb. 27, 2018) ("the public interest is served . . . by ensuring that [Plaintiffs] have recourse to

Article III courts as a check on the powers of administrative agencies.").

Defendants' *only* claimed harm is a purported "interference" in an "ongoing administrative

process"; they claim that the TRO prohibits even *publishing* the rule, which Defendants intended

to do in "early September."[9]  ECF 35 at 17, 37.  But the order restrains Defendants "from *implementing* the Third Mass Cancellation Rule," not publishing it.  TRO Order, ECF 17 at 5 (emphasis added).  Other than to buttress their flawed finality argument, Defendants had no reason not to publish the rule at the beginning of September like they had long planned.

If anything, it is Defendants who are harming the public—not only by trying to promulgate unlawful mass forgiveness, but also by misleading the public.  Everyday Americans lack legal training to know whether these mass cancellation attempts are illegal, but because of that lack of clarity, "more than one-third, 36 percent [of borrowers], said they aren't making consistent payments in hopes the debt will be fully forgiven."[10]  That harms both the borrowers and the public fisc.  The best outcome for the public is for courts to speedily confirm that Defendants' mass cancellation attempts are illegal, and for Defendants to stop their relentless effort to unlawfully cancel hundreds of billions of dollars in student loans.

### IV.    The Requested Relief Is Appropriately Tailored.

Plaintiff States are entitled to the same relief obtained in each of the first two mass cancellation challenges: an order prohibiting implementation of the entire rule.  Defendants ask this Court instead to ignore plainly established Supreme Court precedent from *Biden v. Nebraska*.

---

[9] In a footnote, Defendants claim that "Plaintiffs (through their lead counsel) were able to participate directly in the rulemaking process, through a seat on the committee itself."  ECF 35 at 37 n.10.  Not so.  Defendants limited the Attorney General's Office's participation to that of an "alternate negotiator" with no voting power and no ability even to *speak* without permission of the primary negotiator.  *See Student Loan Debt Relief Committee Organizational Protocols*, https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/student-loan-debt-reliefom-committee-protocols-final-508-accessible.pdf; Committee Member List, https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/student-loan-debt-relief-committee-list-508-accessible.pdf.  After several months, Plaintiffs' counsel withdrew when it became clear that the committee was unwilling to consider obvious problems with the rulemaking, including with the Department's professed statutory authority.

[10] https://www.newsweek.com/millions-not-paying-student-loans-hopes-forgiveness-1950125

While Defendants must make those arguments here to preserve them for appellate review, that precedent binds this Court. The request to dismiss the President should also be rejected.

### A. An order against the entire rule is necessary to ensure complete relief.

Defendants' do not dispute, because they cannot, that the States seek the same exact relief they received from the Eighth Circuit and the Supreme Court in every previous Mass Debt Cancellation lawsuit. Indeed, they entirely ignore that their exact arguments were rejected just last month when the Supreme Court denied Defendants' application to vacate the Eighth Circuit's injunction against their Second Mass Cancellation Rule. Defendants' arguments fail.

**1.** Start first with Defendants' request for this Court to disregard *Biden v. Nebraska* and limit relief to only one State. Defendants contend that it is "incorrect to say, as Plaintiffs do, that only one Plaintiff need show standing for all to be awarded relief." ECF 35 at 38. There is nothing "incorrect" about that rule, which the Supreme Court reaffirmed just last year: "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. at 2365 (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006)); *see also Am. C.L. Union of Georgia v. Rabun Cnty. Chamber of Com., Inc.*, 698 F.2d 1098, 1108 (11th Cir. 1983). Defendants suggest (at 38–39) that the one-plaintiff rule is limited to "appellate court[s]" but ignore that district courts, including this one, regularly apply the same rule. *E.g.*, *Altamaha Riverkeeper v. United States Army Corps of Engineers*, No. CV 418-251, 2020 WL 5837650, at *5 (S.D. Ga. Sept. 30, 2020) (Hall, J.) ("So long as one of the Plaintiffs has standing, the Court need not decide whether each Plaintiff has standing, especially where they seek a particular form of global relief."). Defendants' contention (at 39) that *every* State must establish "independent showings of harm" to obtain any relief is squarely foreclosed by this precedent.

**2.** Next, Defendants note that relief must be "tailor[ed]" to the cause of the injury, but they ignore that both the Supreme Court and Eighth Circuit have twice concluded that when the Federal

Government tries to mass cancel loans, broad relief against the entire rule is necessary to rectify the States' injuries.  Last month, the Eighth Circuit granted relief against the entire Second Mass Cancellation rule and did not limit relief to the Plaintiff States, noting that this was "necessary to provide complete relief to the plaintiffs."  *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024) (quotation marks omitted).  And the Supreme Court rejected Defendants' argument that the relief crafted by the Eighth Circuit against the entirety of the rule was too broad.  *Missouri v. Biden*, No. 24A173 (Aug. 28, 2024) (rejecting Defendants' application to vacate).  The reason is simple.  Relief against the entire rule is necessary because MOHELA is a nationwide loan servicer with 8 million dynamic accounts that flow in and out.

**3.**  No better is Defendants' argument (at 39–40) about 5 U.S.C. § 705 and traditional equitable principles.  Section 705 is best analyzed in conjunction with its sister provision 5 U.S.C. § 706.  Defendants ignore that § 706 provides a clear *statutory* remedy and by default requires vacatur of the entire rule.  It says the "reviewing court *shall* . . . hold unlawful and *set aside* agency action, findings, and conclusions found to be" contrary to law.  5 U.S.C. § 706 (emphasis added).

Consistent with this text, courts across the country have for decades held that "[t]he default rule is that vacatur is the appropriate remedy."  *E.g.*, *Data Mktg. Partnership, LP v. United States Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022); *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action").  Courts began adopting this holding very shortly after enactment of the APA.  *See Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951) (holding that § 706 "affirmatively provides for vacation of agency action").  As Plaintiff States noted in their opening brief (at 53–54), when the Supreme Court found in 2020 that a regulation "violated the APA," the

Supreme Court concluded that the regulation "*must* be vacated."  *DHS v. Regents of the Univ. of Cal.*, 591 U.S 1, 9 (2020) (emphasis added).

Unable to contend with this settled rule, Defendants rely on a concurring opinion by Justice Gorsuch, which expresses preliminary "doubts about vacatur" and urges future "consideration" of this settled rule.  *See United States v. Texas*, 599 U.S. 670, 693, 702 (2023) (Gorsuch, J., concurring).  That opinion, of course, is neither a majority holding nor consistent with the Supreme Court's holding in *Regents*.  Moreover, three of the justices in the majority voiced concerns about Justice Gorsuch's argument. *See* Tr. Oral Arg., *United States v. Texas*, No. 22-58 at 35 (2022) (Chief Justice Roberts, stating Defendants' anti-vacatur argument "sounded to me to be fairly radical and inconsistent with . . . what you do in an APA case."); *id.* at 54–55 (Justice Kavanaugh calling Defendants' argument "a pretty radical rewrite, as the Chief Justice says, of what's been standard administrative law practice"); *id.* at 68 (Justice Jackson agreeing).  Justice Gorsuch's call to reconsider the doctrine does not enable this Court to disregard binding authority like *Regents*.

Section 705 provides equivalent relief to § 706 in the preliminary injunction posture.  It permits a court to "postpone the effective date of an agency action" during litigation.  5 U.S.C. § 705.  This is not a plaintiff-specific statutory remedy.  It is *defendant* specific.  By its plain text, it prohibits the Federal Government from applying a rule to anybody, even to parties not before the court.

Just this April, the Fifth Circuit rejected Defendants' exact argument when raised by the Secretary and Department in *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024).  There, the court held "nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [Plaintiff] or its members.  Instead, we conclude that the scope of preliminary relief under Section

705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Id.* at 255 (collecting citations). This case demands the same result.

### B.  The President is a proper defendant.

Defendants repeat nearly verbatim the same argument for dismissing the President that they advanced in front of the Eastern District of Missouri this summer.  That court rejected that argument. *Missouri v. Biden*, No. 4:24-CV-00520-JAR, 2024 WL 3104514, at *20 (E.D. Mo., June 24, 2024) ("[T]he Court will deny Defendants' request to dismiss President Biden as a Defendant.").  This Court should too.

In asserting (at 40–41) a categorical bar against granting injunctive or declaratory relief against the President, Defendants drastically overstate the law.  Injunctive relief against the President is unavailable only "in general." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992).  There are exceptions. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 199 n.12 (2d Cir. 2019) ("[a] court could require the President to establish a blind trust"), *vacated as moot*, 141 S. Ct. 1262 (2021) (Mem.).

But more importantly, the "general" bar against injunctive relief does *not* apply to declaratory relief. *Franklin* made clear that, despite the limitations on injunctive relief, "the President's actions may still be reviewed for constitutionality."  505 U.S. at 801.  And just a few years later, the Supreme Court imposed declaratory relief against President Clinton for his use of the line-item veto. *Clinton v. City of New York*, 524 U.S. 417, 421, 425 n.9 (1998).  In doing so, the Supreme Court explicitly distinguished "injunctive relief against the President" from "a declaratory judgment" against the President. *Id.* at 425 n.9.

Other courts have long done the same. *E.g.*, *Natl. Treas. Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (employing "the tool of declaratory relief" against the President);

*Knight First Amend. Inst. at Columbia U. v. Trump*, 302 F. Supp. 3d 541, 578–79 (S.D.N.Y. 2018) (declining "to enjoin the President" because "declaratory relief remains available"), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021).  So Defendants are completely wrong to assert that courts "have never submitted the President to declaratory relief."  ECF 35 at 40 (quoting *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)).  Defendants also cite Justice Scalia's concurrence in *Franklin*, where he separately opined that "we cannot issue a declaratory judgment against the President."  505 U.S. at 827.  But Justice Scalia made this statement before *Clinton*, where the Court did just that over his dissent.  *See* 524 U.S. 417.

Even injunctive relief may be available against the President in this case.  Although it is not available "in general," *Franklin*, 505 U.S. at 802–03, it is available where an injury cannot be "redressed fully by injunctive relief against the remaining Defendants," *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated on other grounds*, 583 U.S. 941 (2017).  Here, Plaintiffs have alleged that the President has taken the actions with respect to the Final Rule as part of a pattern to evade the Supreme Court.  ECF 1 ¶¶ 55–56, 61–62; *see also Missouri*, 2024 WL 3104514, at *20 (declining to dismiss the President because "Plaintiffs specifically point to statements made by President Biden indicating his intent to, in Plaintiffs' words, 'evade the Supreme Court'").  At this stage, these allegations must be taken as true.  It is thus possible that the President will try to evade a future preliminary injunction or statutory relief against the Secretary by issuing the cancellation order himself, rather than ordering the Secretary to do so.  The only way to give Plaintiffs relief in that circumstance would be to enjoin the President, and so the *Franklin* exception would exist.

At least at this stage in the proceedings, where this Court must accept every allegation, dismissal is improper.  Declaratory relief is warranted against the President, and Defendants have

not proven that injunctive relief will be categorically barred in all factual circumstances. Defendants motion to dismiss under Rule 12(b)(1) thus must fail.

### V.   Response to Motion to Clarify

The States do not oppose Defendants publishing the rule.  As is clear from Defendants' brief, they would have done so "in early September," ECF 35 at 17, but for their interpretation of the TRO.  The States do not believe the TRO prohibits publishing the rule.  The States cannot, however, consent to clarification that would permit Defendants to continue preparatory work that would enable them to "trigger" loan cancellation "imminently" upon publication.  *Pruitt*, 326 F. Supp. 3d at 1367.  The Court should reject that part of the motion for clarification.

### CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that this Court deny Defendants "Motion to Dismiss for Lack of Venue," ECF 37, and extend the court's injunction against Defendants.

Date: September 13, 2024

Respectfully Submitted,

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

/s/ Stephen J. Petrany
Stephen J. Petrany
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

G. Todd Carter, Esq.
Georgia Bar No: 113601
Special Assistant Attorney General
Office of the Georgia
Attorney General
Brown, Readdick, Bumgartner,
Carter, Strickland &Watkins, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel: 912-264-8544
Fax: 912-264-9667
tcarter@brbcsw.com

**STEVE MARSHALL**
**Attorney General of Alabama**

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine
*Solicitor General*
Reed C. Dempsey
*Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov
reed.dempsey@ago.mo.gov

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/Nicholas Bronni
Nicholas J. Bronni
*Solicitor General*
Dylan L. Jacobs
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

**ASHLEY MOODY**
**Attorney General of Florida**

/s/James H. Percival
James H. Percival
*Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

**DREW H. WRIGLEY**
**Attorney General of North Dakota**

/s/ Philip Axt
Philip Axt
 *Solicitor General*
North Dakota Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

**DAVE YOST**
**Attorney General of Ohio**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
 *Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

## CERTIFICATE OF SERVICE

 I hereby certify that, on September 13, 2024, the foregoing was filed electronically through the Court's electronic filing system and served by email on all parties.

/s/ *Joshua M. Divine*
Solicitor General of Missouri