UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| STATE OF MISSOURI, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> *Defendants*. | Case No. 2:24-cv-00103-JRH-CLR |

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF VENUE**

JILL E. STEINBERG
United States Attorney
Southern District of Georgia

SHANNON H. STATKUS
Assistant United States Attorney
South Carolina Bar No. 70410
United States Attorney's Office
Post Office Box No. 2017
Augusta, Georgia 30903
Tel.: (706) 724-0517

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STEPHEN M. PEZZI
 D.C. Bar No. 995500
 Senior Trial Counsel
SIMON GREGORY JEROME
 D.C. Bar. No. 1779245
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................................1

ARGUMENT..........................................................................................................................................2

I.      BECAUSE GEORGIA LACKS ARTICLE III STANDING, PLAINTIFFS CANNOT ESTABLISH VENUE BASED SOLELY ON GEORGIA'S RESIDENCE. ..........................2

        A.  Georgia lacks Article III standing.................................................................................2

        B.  Georgia's lack of Article III standing means that venue is improper in this District. ..........8

II.     EVEN IF GEORGIA HAD STANDING, VENUE IS STILL IMPROPER BECAUSE GEORGIA DOES NOT RESIDE IN THIS DISTRICT. .......................................................10

III.    DISMISSAL WITHOUT PREJUDICE IS THE APPROPRIATE REMEDY. ....................13

CONCLUSION....................................................................................................................................13

# **INTRODUCTION**

This case has a glaring venue problem, which needs to be addressed before any consideration of the merits, or further injunctive relief. In short, regardless of the allegations of the other Plaintiff States, this case cannot continue in this forum unless the Court holds both that (1) Plaintiff Georgia has Article III standing, and (2) Plaintiff Georgia resides in the Southern District of Georgia. But Georgia's only theory of standing is meritless, as every court to consider the question has agreed. And Georgia resides "[f]or all venue purposes" "*only* in *the* judicial district in which it maintains its principal place of business," 28 U.S.C. § 1391(c)(2) (emphases added)—that is, only in the Northern District of Georgia, where Atlanta is located. So this case should be dismissed in its entirety, without prejudice, for improper venue, for either or both of those two independent reasons.

On the first issue—that is, Georgia's theory of standing based on possible future reductions in state income-tax revenue caused by Georgia's own state income-tax laws—Plaintiffs do not dispute that "[e]very court to consider that theory of standing has rejected it." Defs.' Mot. to Dismiss at 1, ECF No. 37 ("MTD"). This Court should do the same. Once it does, the rest is easy, because a plaintiff who cannot invoke the subject-matter jurisdiction of a federal court cannot be the sole basis for venue in that court, regardless of whether other plaintiffs have standing. Plaintiffs neither respond to the many cases Defendants cited for this proposition nor cite any contrary authority.

That is enough to resolve this entire case. Whatever can be said about the standing theories of Plaintiffs Missouri and North Dakota—both of which at least allege that they have state instrumentalities that play some role in the student-loan market—Plaintiff Georgia makes no similar allegations. So unless this Court becomes the first to endorse Georgia's theory of harm arising from its own state tax code, Georgia lacks standing, and venue is improper. That straightforward conclusion would relieve the Court of the obligation to decide the distinct venue question of whether Georgia "resides" in the Southern District of Georgia within the meaning of the federal venue statute.

Nevertheless, if the Court does reach that second question, Georgia resides "[f]or all venue purposes" "*only* in *the* judicial district in which it maintains its principal place of business," 28 U.S.C. § 1391(c)(2) (emphases added)—that is, only in the Northern District of Georgia, where the state

1

capital is located. To be sure, despite that seemingly straightforward statutory text, several courts have taken a contrary view (as Defendants acknowledged)—though often by ignoring the key statutory arguments that support a plain-text reading. *See* MTD at 10. As one might expect, Plaintiffs rely almost entirely on those prior decisions—with hardly any engagement with the actual text that Congress enacted. In doing so, Plaintiffs put most of their eggs in one basket: one part of one sentence of pure dictum from one 1892 decision of the Fifth Circuit—in a case about the residence of corporations for jurisdictional purposes, not the residence of states for venue purposes. *See Atlanta & F. R. Co. v. Western Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892).

One half-sentence from 1892 doesn't solve Georgia's venue problem. Defendants' state-residence argument turns on a plain-text reading of the federal venue statute, which was not enacted until 1948. So it is, of course, impossible for a court in 1892 to have interpreted that language—much less in a way that is "binding on this Court." Pls.' Resp. at 20, ECF No. 45. If the Court reaches this question, then, it will need to exercise its own independent judgment about whether Congress meant what it said in defining residence "[f]or all venue purposes" in the current version of the venue statute. 28 U.S.C. § 1391(c). And neither Plaintiffs, nor any of the other courts that have addressed the issue, offer any sound basis to depart from the statute's plain text.

Georgia should be dismissed as a plaintiff for lack of Article III standing, and this case should be dismissed, without prejudice, for lack of venue.

## **ARGUMENT**

**I.     BECAUSE GEORGIA LACKS ARTICLE III STANDING, PLAINTIFFS CANNOT ESTABLISH VENUE BASED SOLELY ON GEORGIA'S RESIDENCE.**

**A.     Georgia lacks Article III standing.**

Georgia's only theory of Article III standing turns on future state income-tax revenue consequences created by Georgia's own state income-tax laws. Whatever the viability of the other standing theories in this case advanced by other Plaintiff States, Georgia's only theory lacks merit. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976), establishes that "[n]o State can be heard to complain about damage inflicted by its own hand" in the precise context of future revenue losses caused by

State tax laws. And *Florida v. Mellon*, 273 U.S. 12 (1927), establishes more generally that a federal policy's incidental effects on state tax revenues are not judicially cognizable injuries. So Georgia's only theory of standing is foreclosed by Supreme Court precedent, twice over.

Every court to consider this question in the context of litigation related to the forgiveness of student debt has come to the same conclusion, in reliance on these same authorities. *See Kansas v. Biden*, --- F. Supp. 3d ---, 2024 WL 2880404, at *17 (D. Kan. June 7, 2024) (holding that "[t]he SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them," and that "in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state"), *appeal filed*, No. 24-3093 (10th Cir. July 9, 2024); *Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 937 (S.D. Ind. 2022) (no standing to challenge debt relief based on "an increased state tax burden" because "the Federal Government's student loan relief program did not injure" plaintiffs; rather, "[t]he State's legislative decision did"); *Nebraska v. Biden*, 636 F. Supp. 3d 991, 1002 (E.D. Mo. 2022) ("These States' sovereign power to set its own tax policy is not implicated by the student debt relief plan, and their legislatures are free to propose and pass tax revenue plans as they see fit."), *rev'd on other grounds*, 143 S. Ct. 2355 (2023). This Court should too.

**1.** All of Plaintiffs' counterarguments lack merit. First, at times Plaintiffs try to imply that Georgia cannot in fact set its own tax policy; contending, for example, that the Plaintiff States have "limited legislative time." Pls.' Resp. at 16. That is both incorrect and irrelevant. Just as in *Pennsylvania*, "[n]othing required" Georgia to adopt in full the federal definition of gross income, and "nothing prevents" Georgia from tweaking that definition now (or even retroactively in the future, to account for 2024 loan forgiveness). 426 U.S. at 664. In fact, Georgia does not dispute that it already deviates from the federal definition of income in many respects, large and small. *See, e.g.*, O.C.G.A. § 48-7-27(a)(11.2) ("agricultural losses due to Hurricane Michael"); *id.* § 48-7-27(a)(9) ("the amount of contributions to the Teachers Retirement System of Georgia made by a taxpayer between July 1, 1987, and December 31, 1989"); *id.* § 48-7-27(a)(12.2) (certain "[p]ayments received by a firefighter"). Either way, States cannot manufacture standing by relying on obstacles created by their own legislative calendars, over which they have complete authority. And to the extent "state law is tied to federal

3

law," at least in part, Pls.' Resp. at 15, that is only because Georgia has decided that it should be. Plaintiff Florida, for example, doesn't tax income at all.

Plaintiffs next argue—in some tension with the argument above—that this suit implicates their "sovereign interest in not changing their laws." Pls.' Resp. at 16. But Georgia retains that "sovereign interest" in full, *id.*—nothing in the contemplated agency actions (nor any provision of federal law) requires any State to include or exclude loan forgiveness from its state-law definition of taxable income, nor otherwise constrains state tax law in any relevant sense. So it is not that the Plaintiff States are "force[d]" to "give up other priorities" or "chang[e] their laws," as they say—Plaintiffs simply cannot claim an Article III injury from "*their* laws" in the first place. *Id.* (emphasis added).

That is why it also does not matter if "changing their laws would create administrative burdens," as Plaintiffs assert (without any evidence or explanation). *Id.* Any such "administrative burdens" would still be attributable to Georgia's own legislative choices, not to the U.S. Department of Education. Surely it would not have been costless for the States in *Pennsylvania* to change their tax codes either. All that matters is that any "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures" about state tax law. *Pennsylvania*, 426 U.S. at 664.

Plaintiffs try to get some mileage out of the fact that *Pennsylvania* was filed under the Supreme Court's original jurisdiction, *see* Pls.' Resp. at 16-17, but its holding about this sort of self-inflicted harm being insufficient to establish "a (justiciable) controversy" is equally applicable here, 426 U.S. at 663—after all, the purpose of standing doctrine is to identify disputes that can be classified as "'Cases' and 'Controversies'" under Article III. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017). That is why courts—including the Supreme Court and the Eleventh Circuit—have relied on *Pennsylvania* in the context of more routine standing disputes, including in suits filed by States against the federal government. *See, e.g.*, *FEC v. Cruz*, 596 U.S. 289, 290 (2022); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021). Indeed, Georgia *itself* has obtained at least one dismissal for lack of standing, in the Eleventh Circuit, under *Pennsylvania*. *See Swann v. Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012) (dismissing claims against Georgia for lack of

4

Article III standing in part because "a controversy is not justiciable when a plaintiff independently caused his own injury") (citing *Pennsylvania*, 426 U.S. at 664).

Plaintiffs now rely (at 18) on *South Dakota v. Dole*, 483 U.S. 203 (1987), a case about the unconstitutional-conditions doctrine that does not even address standing, making it irrelevant, *see Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). But to the extent it matters at all, *Dole* supports Defendants. There, Congress enacted a law that would "withhold a percentage of federal highway funds otherwise allocable from States" in which those under the age of 21 could purchase alcohol. *Dole*, 483 U.S. at 205. The goal, of course, was to offer "encouragement to the States to enact higher minimum drinking ages than they would otherwise choose," by threatening to withhold *federal* funding. *Id.* at 211. Here, by contrast, there is no federal funding to States at stake, and the contemplated agency actions at issue are not designed to "encourage[]" the States to do anything at all. *Id.* The Department of Education has no interest in how the States structure their tax codes.

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110 (1979), is even further afield. *Gladstone* is a case about standing to bring race-discrimination claims under the Fair Housing Act, in which the relevant injury was to a municipality's "racial balance and stability." *Id.* at 111. The Court's passing remark about how a "reduction in property values directly injures a municipality by diminishing its tax base" was one illustrative example of the "harms flowing from the realities of a racially segregated community," *id.*; but it was the harms of segregation itself that supported standing in *Gladstone*.

Finally, Plaintiffs cite (at 28) a few out-of-circuit decisions that are fully consistent with Defendants' argument about self-inflicted harm. For example, Defendants have no quarrel here with the proposition that the federal government's "actions injure states when those actions necessitate changes to state laws." *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021). But the actions challenged here do not (and will not) "necessitate changes to state laws," *id.*, so that theory is inapplicable. Similarly, the (vacated) opinion in *Sierra Club v. Trump*, 977 F.3d 853, 868 (9th Cir. 2020), relied on federal action that "impact[ed] California's ability to enforce its state laws," in the face of federal preemption under the Supremacy Clause. But here, with or without student-debt relief, Georgia's state income-tax laws will remain in full effect.

5

**2.** As for *Florida v. Mellon*, 273 U.S. 12 (1927), Plaintiffs disparage it as "a century-old case." Pls.' Resp. at 19. That is an odd charge; old Supreme Court precedent is as equally binding as new. And to the extent that Article III standing doctrine has shifted since 1927, it is stricter in the modern era, *see, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Clapper*, 568 U.S. at 398; *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)—including in suits between the States and the United States, *see, e.g.*, *Texas*, 599 U.S. at 670; *Haaland v. Brackeen*, 599 U.S. 255 (2023); *California v. Texas*, 593 U.S. 659 (2021).

Plaintiffs suggest that *Florida* is outdated because now "courts regularly permit parties to sue based on indirect loss of tax revenue," and that "if a 'direct injury' was required a hundred years ago, it no longer is." Pls.' Resp. at 19. On this, Plaintiffs are simply mistaken—courts routinely hold that an "indirect loss of tax revenue" is *not* sufficient for Article III standing. *Id.*; *see, e.g.*, *Louisiana v. DHS*, 2024 WL 1328434, at *10 (E.D. La. Mar. 28, 2024) ("This is precisely the sort of incidental and attenuated effect on tax revenue that courts have found fails to satisfy the Article III standing requirements.") (citing *Florida*, 273 U.S. at 18); *El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) ("We conclude that a county's loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact."); *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (requiring some "fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged"); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 348 (8th Cir. 1985) (same). Plaintiffs' effort to show standing "based on indirect loss of tax revenue," Pls.' Resp. at 19, is inconsistent with all this precedent.

Plaintiffs also rely heavily on the (very brief) discussion of standing in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), but Defendants already explained why it does not apply. *See* Defs.' MSJ at 7. In *Wyoming*, there was "unrebutted evidence" of a loss of hundreds of thousands of dollars in "severance taxes" as a direct result of the challenged Oklahoma law, which had been adopted with the stated purpose of reducing purchases of coal from Wyoming. 502 U.S. at 445. There are no remotely similar

6

"undisputed fact[s]" here, *id.* at 448, as the connection between the contemplated agency actions and state tax receipts is both indirect and incidental.[1]

Plaintiffs still fail to identify any meaningful limit to their contrary view. Virtually every federal policy has incidental effects on state tax revenues. Labor policy affects incomes (and hence state income taxes); agricultural policy affects food prices (and hence state sales taxes); foreign policy affects oil prices (and hence state gasoline taxes); and housing policy affects real-estate values (and hence state property taxes). A system where any State can challenge any federal policy that incidentally affects its tax revenues would "make a mockery" of Article III. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.). As courts around the country have recognized, "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing." *Wyoming*, 674 F.3d at 1234 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)); *accord Iowa*, 771 F.2d at 348.[2]

**3.** Finally, Defendants also explained why Plaintiffs' tax-revenue theory depends on an impermissibly "speculative chain of possibilities." *Murthy v. Missouri*, 144 S. Ct. 1972, 1993 (2024); *see* MTD at 7. Plaintiffs' only response is based on the premise that, if debt is forgiven "before 2026," "[n]one of that amount can be taxed" by Georgia. Pls.' Resp. at 19. Again, that is incorrect—Georgia is free to structure its tax code however it wishes, which is why it already deviates from the federal definition of income in many respects. *See supra* at 3 (citing three of many examples).

---

[1] Plaintiffs' broad reading of *Wyoming*—as having effectively overruled both *Pennsylvania* and *Florida* sub silentio, *but see Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.")—depends heavily on the Fifth Circuit's several opinions about the policy of immigration-enforcement discretion known as DAPA. *See* Pls.' Resp. at 16-17 (citing multiple opinions captioned "*Texas v. United States*"). But in those cases, the Fifth Circuit assumed that in issuing driver's licenses "the state is required to use federal immigration classifications," due to federal supremacy over immigration law. *Texas*, 809 F.3d at 158. Plaintiffs have not even argued here that Georgia faces any comparable federal constraints on its own state income-tax code.

[2] Plaintiffs also rely (at 15, 19) on *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), another case in which States established standing based on the loss of *federal* funding due to *federal* government choices—an injury that is neither self-inflicted (under *Pennsylvania*) nor unduly attenuated (under *Florida*), unlike the future loss in state tax revenue that is allegedly at issue here.

7

**B.     Georgia's lack of Article III standing means that venue is improper in this District.**

As Defendants established in their motion, *see* MTD at 8-9, a plaintiff who lacks standing cannot create venue where it would not otherwise exist. The precedent on this point is robust. *See Miller v. Albright*, 523 U.S. 420, 426-27 (1998) (op. of Stevens, J.); *Dayton Area Chamber of Com. v. Becerra*, No. 3:23-cv-156, 2024 WL 3741510, at *8 (S.D. Ohio Aug. 8, 2024); *Kansas v. Garland*, 2024 WL 2384611, at *3 (E.D. Ark. May 23, 2024); *Nat'l Infusion Ctr. Ass'n v. Becerra*, No. 1:23-cv-707, — F. Supp. 3d —, 2024 WL 561860, at *5 (W.D. Tex. Feb. 12, 2024), *appeal filed* No. 24-50180 (5th Cir. Mar. 14, 2024); *Mich. Ass'n of Pub. Sch. Acads. v. U.S. Dep't of Educ.*, No. 1:22-cv-712, — F. Supp. 3d —, 2023 WL 455079, at *5 (W.D. Mich. Jan. 10, 2024); *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1304 (N.D. Ala. 2003).

Again, "[i]f that were not the rule, then Plaintiffs could have enlisted any citizen of Augusta with policy objections to student debt relief to serve as a nominal plaintiff, solely to create venue in this District," MTD at 9—a nonsensical outcome. In any event, Plaintiffs do not cite a single case to the contrary. So there is no basis in law or logic to reach any other conclusion—and what little Plaintiffs do say on the subject is confused, meritless, or both.

First, in a telling effort to redirect this Court away from what Plaintiffs call a "hyperfocus on Georgia's standing," Plaintiffs argue that "[s]o long as one of the Plaintiffs has standing, the Court need not decide whether each Plaintiff has standing." Pls.' Resp. at 20 (quoting *Altamaha Riverkeeper v. Army Corps of Eng'rs*, 2020 WL 5837650, at *5 (S.D. Ga. Sept. 30, 2020)). Even if that were correct in the context of Article III standing alone, *but see* Defs' PI/TRO Opp'n at 29-30, ECF No. 35, here it is a non sequitur, and non-responsive to Defendants' motion to dismiss for improper *venue*. Venue and standing are two separate and independent threshold requirements. And as the complaint itself confirms, the only possible basis for venue in this Court—for Missouri, for Georgia, or for any of the Plaintiffs—is based on Georgia's appearance in the case caption. *See* Compl. ¶ 31 (citing 28 U.S.C. § 1391(e)(1)). But that only works if Georgia *belongs* in the caption—as confirmed by the legion of cases cited above, to which Plaintiffs offered no response.

8

Second, Plaintiffs point out that, "[i]n a student-loan lawsuit brought by Kansas in the District of Kansas against [what Plaintiffs refer to as] the Second Mass Cancellation Rule, the district court dismissed Kansas for lack of standing but—concluding that other States had standing—retained jurisdiction to rule against the Federal Government on the merits." Pls.' Resp. at 22 (citing *Kansas*, 2024 WL 2880404, at *17). Again, this is a question of proper venue, not one of "retain[ing] jurisdiction." *Id.* But more importantly, in the *Kansas* case, defendants never objected to venue in the District of Kansas (largely for case-specific reasons about the procedural posture of that litigation, which are irrelevant and inapplicable here). In *Kansas* that was dispositive because venue is a forfeitable defense. *See* Fed. R. Civ. P. 12(g)(2), (h)(1). So the district court in *Kansas* was never asked to address venue, never had to address venue, and never did address venue. Here by contrast, Defendants have made a timely objection to venue. So at least on this issue, *Kansas* is irrelevant.[3]

Third, seizing on one "see also" citation in Defendants' motion (at 9)—after ignoring the seven case citations that preceded it—Plaintiffs (at 22) seem to embrace a statement in the leading treatise on the Federal Rules of Civil Procedure, which states (correctly) that "venue cannot be based on the joinder of a plaintiff with a frivolous claim or of a plaintiff who has been improperly and collusively joined for the purpose of creating venue in the district." 14D Wright and Miller, Federal Practice & Procedure § 3815 (4th ed. June 2024) (footnotes omitted). Plaintiffs say that "Defendants do not contend that any of these things occurred." Pls.' Resp. at 22. But Defendants did not have to—that sort of "improper" joinder is an *additional* reason why venue might be improper—not the *only* possible reason. And here, venue is improper for the far more straightforward reason that the only venue-creating Plaintiff lacks standing. Plaintiffs cite no case, no treatise, and no authority at all to the contrary. So the Court need not decide whether any of the other Plaintiffs were joined "improper[ly]" or "for the purpose of creating venue in the district," *id.*—whatever Plaintiffs' intent in structuring their lawsuit this way, they chose an improper venue. That warrants dismissal.

---

[3] Plaintiffs' reliance on *Kansas* is otherwise in significant tension with their position on Georgia's theory of standing: that court squarely held that "[t]he SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them" and that "in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state." 2024 WL 2880404, at *17.

9

\*   \*   \*

For these reasons, the Court need not decide whether the State of Georgia resides "only in the judicial district in which it maintains its principal place of business," 28 U.S.C. § 1391(c)(2), or instead resides simultaneously in all three federal districts in Georgia. It is enough to conclude that, wherever Georgia resides, its lack of Article III standing means it should be dismissed from this case for lack for subject-matter jurisdiction under Rule 12(b)(1), and that this case should then, necessarily, be dismissed for improper venue under Rule 12(b)(3).

## II.  EVEN IF GEORGIA HAD STANDING, VENUE IS STILL IMPROPER BECAUSE GEORGIA DOES NOT RESIDE IN THIS DISTRICT.

Even if Georgia had Article III standing, venue is still improper in this District for an entirely different reason. Plaintiffs' only venue theory hinges entirely on the notion that "Plaintiff Georgia is a resident of this judicial district because a State resides everywhere within its borders." Compl. ¶ 31. But that conclusory allegation ignores the text of the federal venue statute—as does Plaintiffs' response brief, and virtually all the cases it cites on this issue.

**a.** Congress explicitly defined the terms of "[r]esidency" "[f]or *all* venue purposes," 28 U.S.C. § 1391(c), (d) (emphasis added). Accordingly, the only question for this Court is which of the residency definitions enumerated in § 1391 applies to Georgia. As explained, *see* MTD at 10-11, of the choices available, Georgia is (and can only be) "an entity with the capacity to sue and be sued in its common name under applicable law" within the meaning of 28 U.S.C. § 1391(c), (d) (rather than "a natural person," a "corporation," or "a defendant not resident in the United States").

There is nothing "strange," Pls.' Resp. at 20, about an interpretation of the word "entity" that includes States. Indeed, Black's Law Dictionary defines an "entity" as "[a]n organization (such as a business *or a governmental unit*) that has a legal identity apart from its members or owners." *Entity*, Black's Law Dictionary (11th ed. 2019) (emphasis added). A "state"—that is, "[a]n institution of self-government within a larger political entity; esp., one of the constituent parts of a country having a federal government"—fits comfortably within that definition. *State*, Black's Law Dictionary (11th ed. 2019). Moreover, Congress itself has often defined "entity" to include governmental units, such as

10

States, providing further evidence that Congress did not mean to exclude States from the definition of entity by silence alone. *See, e.g.*, 2 U.S.C. § 1602(14) ("entity" includes "State or local government"); 11 U.S.C. § 101(15) ("entity" includes "governmental unit"); 18 U.S.C. § 2711(4) ("governmental entity" includes "any State").

Thus, "[f]or all venue purposes," a State is an "entity" that, "if a plaintiff," resides "*only* in *the* judicial district in which it maintains its principal place of business*,*" 28 U.S.C. § 1391(c)(2) (emphases added)—here, the Northern District of Georgia.

**b.** To be sure, as Defendants acknowledged in their motion (at 10), despite the clarity of this statutory text, several courts have interpreted the language in 28 U.S.C. § 1391(c) as having an unwritten, implied exception for State plaintiffs. But none of those decisions are binding here, and this Court should not repeat their mistakes. After all, there are few principles that find stronger support in modern Supreme Court precedent than the paramount nature of plain statutory text. Plaintiffs may think that it would "make sense" for the statute to include an exception for State plaintiffs, Pls.' Resp. at 21, but the courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020); *accord Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").

Plaintiffs further argue that "the statute 'makes no reference one way or the other as to the residency of a sovereign state.'" Pls.' Resp. at 21 (quoting *Texas v. DHS*, 661 F. Supp. 3d 683, 689 (S.D. Tex. 2023)). But that is the fundamental problem with *Plaintiffs'* reading, which calls for a judicial amendment to the statute via an implied exception for States that Congress did not include in the text. Because the statute "makes no reference" to any specific residency rule that applies only to States, *id.*, they are covered instead by the more general provision for "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated," 28 U.S.C. § 1391(c)(2).

**c.** Plaintiffs rely most heavily on one part of one sentence of dictum from one 1892 decision of the Fifth Circuit—a case about the residence of corporations for jurisdictional purposes, not the

11

residence of states for venue purposes. *See Atlanta & F. R. Co. v. Western Ry. Co. of Ala.*, 50 F. 790 (5th Cir. 1892). There, the Fifth Circuit stated that "whether, like the state government," a corporation "resides at every point within the boundaries of the state, or its residence is limited to the places where it does business, or to the place designated in its charter as its principal place of business, must depend on the law, general or particular, giving and governing its life." *Id.* at 791. Contrary to Plaintiffs' argument (at 20), *Western Railway* is not "binding on this court" on this issue, for several reasons.

First and most fundamentally, Defendants' state-residence argument turns on a plain-text reading of the current version of the federal venue statute. But Congress's first statute defining "residency" for venue purposes was not enacted until 1948, many decades after *Western Railway*. *See* Act of June 25, 1948, ch. 646, sec. 2, § 1391, 62 Stat. 869, 935. And the statute has been modified several times since, as recently as 2011. *See* Federal Courts Jurisdiction & Venue Clarification Act of 2011, Pub. L. No. 112-63, sec. 202, 125 Stat. 758, 763. Obviously, it is impossible for a court in 1892 to have rejected an interpretation of statutory text that was first enacted over a half-century later.

Second, *Western Railway* is a decision about the residence of a corporation for purposes of personal jurisdiction, not venue. *Western Railway*, 50 F. at 791. Those two doctrines sometimes overlap in other respects, but here they are analytically distinct—this Court is interpreting the venue statute, not a judge-made doctrine about personal jurisdiction. *See, e.g.*, *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("It would be error . . . to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries.").

Third, more recent precedent from the Supreme Court has explicitly cautioned against loose interpretation of the federal venue statute in service of subjective policy goals. In short, "[t]he requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction." *Olberding v. Ill. Cent. R. Co.*, 346 U.S. 338, 340 (1953); *see also Leroy v. Great W. United Corp.*, 443 U.S. 173, 186-87 (1979) (in interpreting a prior version of the venue statute, rejecting an interpretation that would subject government "officials to suit in almost every district in the country," because "such a reading" would "leave the venue decision entirely in the hands of plaintiffs, rather than making it primarily a matter

of convenience"). That should be especially true in suits against the United States—in which the plaintiff's interests *already* receive special, additional consideration, because venue is always available where "the plaintiff resides." 28 U.S.C. § 1391(e)(1)(C). There is no need to broaden that provision even further, based on subjective notions of "common sense," *Alabama v. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005), divorced from the actual text of the statute.

The result is that, even if Georgia could show Article III standing, it resides "[f]or all venue purposes" "*only* in *the* judicial district in which it maintains its principal place of business," 28 U.S.C. § 1391(c)(2) (emphases added)—that is, only in the Northern District of Georgia. So, even setting aside the viability of Georgia's only theory of standing, venue is improper in the Southern District of Georgia, in which no Plaintiff resides.

## III.  DISMISSAL WITHOUT PREJUDICE IS THE APPROPRIATE REMEDY.

Plaintiffs do not dispute that, if venue is improper, "the interest[s] of justice" favor dismissal, rather than transfer, under the circumstances. 28 U.S.C. § 1406(a); *see* MTD at 11-12. Plaintiffs likewise do not dispute that, as to all Plaintiffs other than Georgia, the Court can dismiss on venue grounds without deciding any other issue, because "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007); *see* MTD at 12 n.5. Accordingly, because no Plaintiff with Article III standing—indeed, no Plaintiff at all—resides in the Southern District of Georgia, this case should be dismissed in its entirety, without prejudice, for lack of venue.

## CONCLUSION

For the reasons set forth above and in Defendants' motion, the Court should dismiss Plaintiff Georgia for lack of subject-matter jurisdiction under Rule 12(b)(1), and dismiss this case, without prejudice, for lack of venue under Federal Rule of Civil Procedure 12(b)(3).[4]

---

[4] If the Court disagrees with Defendants on all of the arguments they have raised in their motion to dismiss and in their opposition to Plaintiffs' motion for injunctive relief, Defendants respectfully suggest that any future order should, at a minimum, permit the promulgation of a final rule, as all parties agree its present order should or does. *See* Defs.' Mot. for Clarification of TRO at 2, ECF No. 38; Pls.' Combined Mem. of Law at 34, ECF No. 45.

13

| | |
|---|---|
| Dated: September 16, 2024 | Respectfully submitted, |
| JILL E. STEINBERG<br>United States Attorney<br>Southern District of Georgia | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General<br><br>MARCIA BERMAN<br>Assistant Branch Director |
| /s/ Shannon H. Statkus<br>SHANNON H. STATKUS<br>Assistant United States Attorney<br>South Carolina Bar No. 70410<br>United States Attorney's Office<br>Post Office Box No. 2017<br>Augusta, Georgia 30903<br>Tel.: (706) 724-0517 | /s/ Stephen M. Pezzi<br>STEPHEN M. PEZZI<br> D.C. Bar No. 995500<br> Senior Trial Counsel<br>SIMON GREGORY JEROME<br> D.C. Bar. No. 1779245<br> Trial Attorney<br>United States Department of Justice<br>Civil Division, Federal Programs Branch<br>1100 L Street, N.W.<br>Washington, D.C. 20005<br>Tel.:  (202) 305-8576<br>Email:  stephen.pezzi@usdoj.gov<br><br>*Counsel for Defendants* |